UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 19 CR 277 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CONCEPCION MALINEK | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Concepcion Malinek spent nearly 10 years exploiting a segment of society's most vulnerable population for her personal profit. Malinek dangled the vision of the American Dream in front of desperate people and, once she had them trapped in her web, instead revealed an American Nightmare to them. There were no white picket fences or endless shopping sprees in Malinek's America. Instead the victims were packed like sardines into Malinek's basement, and together they fought off the roaches, lice, mold, and desperation of their new life.

Malinek knew once these people were in her basement she would be able to maintain control of them. Malinek marched most of her victims to a local factory where they would work 40-hour weeks just to turn their paychecks over to Malinek come payday. To keep her victims silenced, Malinek threatened them with deportation and the loss of their children if they ever told anyone about their debt to her or their living arrangements inside her home.

1

For her 10 years of trafficking and exploiting the many children, women and men who fell into her trap, the government requests this Court sentence Malinek to a within-Guidelines term of 97 months' imprisonment, along with a restitution payment to her victims totaling $112,545.[1] This sentence will not only protect the public from a dangerous woman who targets and exploits some of the most vulnerable, but will also send the message that the consequences of trafficking human beings are real, swift, and significant.

## I. MALINEK SHOULD RECEIVE A SENTENCE OF 97 MONTHS'

Concepcion Malinek did not make a one-time bad decision. She devised and executed a long-term, cruel, and criminal plan to trap and exploit human beings. Malinek knew from personal experience the terrible conditions her victims lived in and anticipated their blind willingness to take any chance for a better life for their families. Seizing on this known sense of helplessness among her targets, Malinek dangled false promises and prices in front of her victims in order to get them to take those first steps out of Guatemala and enroute to her basement. Once here, Malinek knew she could subject these victims to nearly any type of abuse and exploitation she desired with limited objections. Malinek knew her victims were scared of deportation and separation from their loved ones far more than they dreaded the abuse and

---

[1] The Government and Probation anticipate the Guidelines Range for this offense to be 78-97 months' imprisonment.

2

exploitive actions she imposed on them. Malinek controlled her victims' every move, knowing their whereabouts at all times, the exact amount of each paycheck she stole from them, and what levers to push and pull to keep them all in line. Malinek used her control over the victims to conceal her activities. She had a callous disregard for their well-being. A two-year-old child of one of the individuals being trafficked was seriously injured while living in her house; she purposely denied that child medical attention so her scheme would not be detected, and threatened the parents with deportation if they tried to seek medical assistance for their child themselves. A 97-month sentence is sufficient but not greater than necessary to accomplish the sentencing goals detailed below.

## A. Seriousness of the Offense

This case epitomizes why labor trafficking is such a serious and exploitive offense. Traffickers, like Malinek, target victims who are powerless. Victims who are too afraid to speak up and reach out to anyone for help from a terrible situation. Malinek used her victims' terrible life circumstances in Guatemala against them on two fronts. First, as a way to convince them they should leave Guatemala and come to the United States for a better life. Then, once here and under her direct control, as a way to maintain their silence about her exploitive criminal conduct. Threatening each victim that if they ever

breathed a word about her own criminal conduct in exploiting these victims, she would have them deported and separated from their children and loved ones.

Malinek's scheme was both simple and effective. Malinek used her connections in her hometown in Guatemala to select some of the most susceptible victims: those she knew were desperate enough to risk everything and leave their home for a chance at a better life in the United States. Malinek would initially quote a small fee to her victims, typically around $5,000 for her services, and sold her victims the dream of a future in America much better than their present. Once Malinek's victims agreed to come to the United States, Malinek assisted in their illegal smuggling across the border and eventually to her residence in Cicero, Illinois.

Once Malinek had her victims inside her residence, she would inform the victim of their "debt," which was substantially higher than the original quoted amount and now ranged anywhere from $18,000-$42,000. While her victims were still dazed by the new "debt" owed, Malinek obtained fraudulent social security and legal permanent resident cards for the victims, so Malinek could have them marched off to a local factory where they would work 40 hours a week, in frigid conditions to earn money to pay off their "debt" to Malinek. Malinek drove her victims to work every day and picked them up at the end of

4

the shift, and charged the victims for transportation, adding it to their debt. On payday, Malinek required that the victims give her almost the entirety of their checks. At times, Malinek even had the entire paycheck endorsed over to her.

When they were not working, all of the victims resided in Malinek's residence, most crammed into bunkbeds in the basement. On the day of Malinek's arrest, there were 33 individuals living in Malinek's single family home in Cicero, 22 of whom resided in the basement. All 22 individuals shared a single bathroom in the basement. Agents observed the walls all covered with mold and the victims reported cockroaches and other squalid conditions during their time residing in Malinek's basement. Malinek charged each victims hundreds of dollars a month, which she added to their debt, as "rent" to live in these poor conditions.

Malinek constantly threatened her victims telling them that they were to never tell anyone about the debt they owed her or that they lived in her residence, and that if they ever mentioned either of these things she would have them deported and she would keep their children. Malinek's threats worked, keeping this vulnerable section of society quiet because they were too afraid to contact law enforcement despite Malinek's abuse and exploitation. One of Malinek's victims, Victim 4, reported that Malinek told her and the

5

other victims that if they ever told anyone about what was happening in the house they would be deported "**because they were poor and she was rich and would not lose**."

One of Malinek's victims, Victim 1, was just 15 years old when she arrived at Malinek's residence. Malinek knew Victim 1 was only 15 and instead of sending Victim 1 to school, where she belonged, Malinek obtained fake identity documents for Victim 1 so Victim 1 could spend 40 hours a week in a cold sandwich factory in order for Malinek to take her paychecks. Victim 1 described her experience with Malinek in part as follows:

> Malinek was verbally abusive to me and the others in the house. Malinek would tell the adults that if anyone told anyone about what was happening in the house or their debt payments to Malinek that she would have them deported back to Guatemala and Malinek would keep their kids here with her.  Malinek would tell the adults the kids loved her more than them.  Malinek also threatened my dad that she would tell immigration officials that he sexually abused me, which was not true, if he talked about what was happening in the house. I was scared of Malinek.  Malinek gets very angry at times and I was not sure what she would do to us when she was angry. One time I watched her hit my 5 year old cousin with a belt and he started crying. I also heard Malinek threaten Malinek's brothers who were from Guatemala that she would call immigration officials and have them deported. When I would call my mom on the phone, Malinek would send Malinek's nephew to listen to what I was saying. (GV, at 4).

Victim 1 was not Malinek's youngest victim. Malinek's youngest victim was the 2-year-old son of Victims 8 and 9. As with the other victims, Victims 8 and 9 were told by Malinek that they owed her an exorbitant debt which they

would likely never be able to pay off. Both Victims 8 and 9 worked full time at the sandwich factory in an attempt to pay off the debt and escape Malinek's wrath. While Victims 8 and 9 worked, they were required to pay Malinek's parents to watch over their 2-year-old son. The price of this child care was set by Malinek, and the cost was added to Victims 8 and 9's debt.

One day, while at the factory, Victim 9 received a call that there had been an accident involving her son. Victim 9 rushed home and found her son in extreme pain with severe burns covering his entire scalp. According to Malinek, the 2-year-old child pulled a mug of hot tea off a counter and it scalded his head.   Victims 8 and 9 pleaded with Malinek to let them bring their son to the hospital. Malinek refused, threatening Victims 8 and 9 with deportation if they attempted to seek medical help for their son. Malinek sought no help for the child, instead providing Victims 8 and 9 with tomato sauce to apply to their son's wounds. For days, Victims 8 and 9 had to watch their son suffer through this extreme pain without any medical treatment.[2]

Victim 10 was trafficked by Malinek for over 6 years, held inside Malinek's home, and forced to work for Malinek and turn over her pay to

---

[2] As described below, it is incidents such as this that truly exemplify the seriousness of labor trafficking. It is a crime where there is such a power imbalance between the trafficker and their victims that the trafficker is even able to control and silence parents who have to watch a two-year old child suffer in pain and anguish when they know a doctor could provide instant relief to their ailing child.

Malinek as payment for Malinek's made-up debt. When Victim 10 asked Malinek why her debt increased so much from the original amount Malinek quoted her, Malinek told her it was interest charged by the bank that caused the increase. When Victim 10 asked to speak to someone at the bank, Malinek told Victim 10 that she was not "smart enough" to talk to someone at the bank and that if she did not pay her debt off she would be deported. Victim 10 paid Malinek a total of $25,000 before Malinek agreed to let her leave Malinek's residence.

### B. Protect The Public and Provide Adequate Deterrence

Malinek's conduct here demonstrates just how dangerous traffickers are and how difficult they are to catch. Traffickers like Malinek know how to harness the power of a dream and use it to create a nightmare for her victims. The fact that there were over 20 victims inside her home at the time of the FBI raid, none of whom had the ability or courage to speak up despite their constant exploitation and abuse, demonstrates just how dangerous traffickers such as Malinek are to the public, and especially its most vulnerable members. For over 10 years Malinek was able to control and exploit her victims without detection. At least for the next 97 months, the public should be free from her exploitive tactics.

More so than just protecting the public from Malinek, the deterrent effect

8

that this Court's sentence will have on the community is one of the primary driving forces of the government's sentencing recommendation. Labor trafficking cases are difficult to detect and prosecute, which makes the deterrent value of the sentences imposed in the cases that are brought so critical. If there is hope of deterring labor trafficking, the sentences in cases that result in a guilty finding must be significant. Traffickers operating today should receive the message that if you engage in the labor trafficking of children, women, or men in the Chicagoland area, the sentence will be severe.

### C.    History and Characteristics of the Defendant

Malinek's background appears similar to many of the victims she exploited in this offense. Malinek herself left her country of Guatemala looking for a better life. Malinek's use of that same dream that she followed to exploit her fellow community members makes her crime even more reprehensible. Malinek fully understood the value her established roots here in the United States had to a poor immigrant coming to a foreign land. Malinek utilized her own personal history not to make things easier for her brothers and sisters from Guatemala but instead as another means of control and exploitation.

The government also notes Malinek claims no income from 2015 through 2019 and her statement that she "was supported by her husband during this time period." This is incorrect. Malinek fails to account for the profits she made

from the trafficking of all the victims listed in the indictment along with the thousands of dollars she forced them to pay her.

### D. Supervised Release

The government recommends the imposition of a term of supervised release of three years. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in defendant's rehabilitation and reintegration into society, the government supports Probation's recommendation that the term of supervised release include the conditions set forth in the PSR.

### E. Restitution

The government previously submitted a restitution request in the amount of $112,545. The breakdown for this request has been provided to the Probation Officer and includes the cost of counseling for many of these victims to process and overcome the mental abuse inflicted upon them by Malinek. As noted in the Malinek's plea declaration, Malinek has agreed to pay restitution for all 10 victims identified in the indictment.

## II. CONCLUSION

For the reasons stated above, the government respectfully requests that this Court impose a sentence of 97 months' imprisonment. A 97-month sentence sends the message to the victims, the community, and most

importantly, other labor traffickers in our community that labor trafficking will not be tolerated, no matter what. A 97-month sentence also is long enough to send Malinek the message that this crime must be taken seriously.

Respectfully,

JOHN R. LAUSCH, JR
United States Attorney

By:    */s/ Christopher V. Parente*
CHRISTOPHER V. PARENTE
ASHLEY CHUNG
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-2447