1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )
4             Plaintiff,             )
                                     )
5             v.                     )   No. 19 CR 00277
                                     )
6   CONCEPCION MALINEK,              )   Chicago, Illinois
                                     )   March 23, 2021
7             Defendant.             )   1:06 p.m.

8             TRANSCRIPT OF PROCEEDINGS - Sentencing
                           Volume 1
9         BEFORE THE HONORABLE EDMOND E. CHANG

10  APPEARANCES:
    For the Plaintiff:         HON. JOHN R. LAUSCH, JR.
11                             United States Attorney
                               BY:  MR. CHRISTOPHER V. PARENTE
12                             Assistant United States Attorney
                               219 South Dearborn Street, Suite 500
13                             Chicago, Illinois 60604
                               (312) 353-5300
14                             christopher.v.parente@usdoj.gov

15  For the Defendant:         MR. ROBERT L. RASCIA
                               MR. LIAM KELLY
16                             650 North Dearborn Street, Suite 700
                               Chicago, Illinois 60654
17                             (312) 994-9100
                               rrascia@rasciadefense.com
18
    ALSO PRESENT:              MS. KATHLEEN O'HANLON and
19                             MR. JORGE CARBAJOSA,
                               Court Interpreters
20
    ALSO PRESENT VIA VIDEOCONFERENCE:
21                             MS. LISA RUIZ,
                               United States Probation Office
22
    Court Reporter:         Judith A. Walsh, CSR, RDR, F/CRR
23                          Official Court Reporter
                            219 South Dearborn Street, Room 2118
24                          Chicago, Illinois 60604
                            (312) 702-8865
25                          judith_walsh@ilnd.uscourts.gov

1          (Proceedings heard in open court:)

2               THE CLERK:  19 CR 277, USA versus Concepcion Malinek.

3               THE COURT:  You can -- counsel can stay at the

4     counsel tables and just talk into the mikes right there.  So

5     everyone can sit.

6               All right.  Let's get appearances for the record, for

7     the government first.

8               MR. PARENTE:  Good afternoon, your Honor.  Chris

9     Parente for the United States.

10              MR. RASCIA:  Good afternoon, your Honor.  Robert

11    Rascia and Liam Kelly for Ms. Malinek.

12              THE COURT:  Okay.  Good afternoon to you.

13              And I note the defendant's presence.

14              And we should get the appearance of the interpreter

15    as well.

16              INTERPRETER O'HANLON:  Good afternoon, your Honor.

17    Kathleen O'Hanlon, interpreter.

18              INTERPRETER CARBAJOSA:  Good afternoon, your Honor.

19    Jorge Carbajosa, interpreter.

20              THE COURT:  All right.  Good afternoon to you.

21              And I believe we have the probation officer by phone.

22              THE PROBATION OFFICER:  Yes.  Good afternoon, your

23    Honor.  Lisa Ruiz on behalf of the probation office.

24              THE COURT:  Oh, and by video as well.  All right.

25    Good afternoon to you.

1          Okay.  We are here for the sentencing.  Are both
2    sides ready to proceed?  Mr. Parente?
3          MR. PARENTE:  Yes, your Honor.
4          THE COURT:  Mr. Rascia?
5          MR. RASCIA:  Your Honor, I am.  I just want to note
6    for the record that I have spent as much time as I was allowed
7    by Livingston County over the last several months doing
8    telephone conferences and videoconferences with Ms. Malinek.
9    She did request on multiple occasions that I make an in-person
10   visit, but Livingston County did not allow that.  I just want
11   to make sure that she's ready.  She told me previously that
12   she was, but I'd like her to acknowledge that.
13         THE COURT:  Okay.  Yes.  Thanks for that information.
14   I will certainly elicit that from Ms. Malinek.
15         And to do that, though, Ms. Malinek, I need to first
16   have you put under oath to tell the truth.  As any non-lawyer
17   speaking in court, you do have to be put under an oath.
18         So I will ask the courtroom deputy to do that now.
19         THE CLERK:  Ms. Malinek, if you would please raise
20   your right hand.
21      (Defendant sworn through the interpreter.)
22         THE DEFENDANT:  Yes, that's correct.
23         THE CLERK:  Thank you.
24         THE COURT:  Okay.  Thank you, Ms. Malinek.  All
25   right.  So, Ms. Malinek, have you had enough time to prepare

1    for today's sentencing?

2              THE DEFENDANT:  Yes, that's correct.

3              THE COURT:  For example, have you had enough time to

4    read over the sentencing filings in this case?  And that

5    includes the presentence report which was that long document,

6    single spaced, as well as the supplemental reports that were

7    filed in this case.

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  Also, have you had enough time to discuss

10   the sentencing with your attorney, Mr. Rascia?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  And it does sound like he had some

13   difficulties in arranging time to visit with you and so,

14   therefore, he spent more time talking to you over the phone.

15   But do you feel prepared for today's sentencing?

16             THE DEFENDANT:  Yes, that is correct, your Honor.

17             THE COURT:  Okay.  Now, I'm also going to ask you

18   whether you are still satisfied with the advice and

19   representation that Mr. Rascia has provided to you in this

20   case.  Are you satisfied with his advice and representation?

21             THE DEFENDANT:  Yes, your Honor.  That's correct, I

22   am satisfied.

23             THE COURT:  Okay.  And lastly, for example, has he

24   tried to answer the questions that you have posed to him?

25             THE DEFENDANT:  That's correct.

1      THE COURT:  All right.  I also want to -- that's all
2  I have for you right now, Ms. Malinek.
3      I wanted to just get a couple other things on the
4  record.  First, there had been quite a bit of logistical
5  arrangements that had to be made.  We do have two overflow
6  courtrooms given the social distancing requirements.
7      And also, I want to note for the record that there
8  will be some victim witnesses who will be making statements
9  either by video or by phone.  And I wanted to make sure,
10  Mr. Rascia, that you don't have an objection to those remote
11  appearances.
12      MR. RASCIA:  Your Honor, I do not.
13      THE COURT:  Okay.  And then also, I believe the
14  defense is going to be presenting three in-person witnesses on
15  behalf of the defendant.  And so they will be testifying here
16  in person.  And I wanted to make sure that you had no
17  objection that they remain masked.
18      MR. RASCIA:  I do not have an objection, your Honor.
19  And I think I did respond to that email earlier today, but
20  that's still my answer.  No objection.
21      THE COURT:  Okay.  Thank you.  Yes, I'm just putting
22  it on the record.  It was quite a bit of logistics to work
23  out.
24      MR. RASCIA:  I just wanted to make sure I didn't
25  forget something.

1      THE COURT:  Okay.  Then let's talk about the

2  presence report itself.  So other than the two

3  objections -- I think you ended up with two, Mr. Rascia,

4  objections to the guidelines calculations -- were there any

5  other objections or corrections that you wanted to propose?

6      MR. RASCIA:  No, your Honor.

7      THE COURT:  Okay.  And how about for the government?

8      MR. PARENTE:  No, your Honor.

9      THE COURT:  Okay.  Setting aside the -- and let me

10  just make sure, Mr. Rascia, you ended up with an objection to

11  the bodily injury to victim enhancement and then the

12  vulnerable victim enhancement.  And those are the two; is that

13  correct?

14      MR. RASCIA:  That is correct, your Honor.

15      THE COURT:  All right.  So other than -- setting

16  those aside for now, I do adopt the presence report as

17  based on detailed and reliable information.

18      Okay.  Let's talk about those guidelines

19  calculations.  Okay.  There's no dispute over the base offense

20  level under 2H4.1, so the base offense level is 22.  There is

21  no longer a dispute over the three-level increase for someone

22  who was involuntary -- was in involuntary servitude for a year

23  or more.  That's under B3A.  Okay.  And there's no dispute

24  over the two-level increase that another felony was committed

25  during and in connection with the underlying offense.  That's

1  under B4A in light of the fraudulent documents, immigration

2  documents.  Okay.  The rest are disputed.  And then there's a

3  three-level decrease for acceptance of responsibility.

4        Okay.  So are those, in -- those particular

5  guidelines are not disputed, Mr. Parente?

6        MR. PARENTE:  That's correct, Judge.

7        THE COURT:  And Mr. Rascia?

8        MR. RASCIA:  That's correct, your Honor.

9        THE COURT:  Okay.  Then let's talk about the disputed

10  ones.  Okay.  On the victim, that a victim suffered bodily

11  injury, obviously, I've read all the filings.  Do you have

12  anything more to add on this for the government?

13        MR. PARENTE:  A little argument, your Honor, yes.

14        THE COURT:  All right.  Go ahead.

15        MR. PARENTE:  You know, Judge, this enhancement says

16  if any victim sustains serious bodily injury, increase by two

17  levels.  And I want to be clear that the defendant's only

18  objection here is that this child should not be considered a

19  victim.  It does not -- it is not objecting to whether it was

20  serious bodily injury or anything like that.  It is solely

21  based on the child not being labor trafficked and, therefore,

22  he can't be a victim.  And we would dispute that now.

23        The guidelines -- but this guideline does not define

24  "victim," but there are definitions that are used by Congress

25  and also in the guidelines that define "victim."

1    Specifically, for the victim's rights statutes under 3771(e)

2    and the Mandatory Victim Rights Act under 3663A(a)(2), it

3    defines a crime victim as, quote, "a person directly or

4    proximally harmed as a result of the offense."  And then

5    although this guideline doesn't define "victim" in the context

6    of bodily harm, 2B1.1 does, and it defines a victim as any

7    individual who sustained bodily injury as a result of the

8    offense.

9         So with that sort of as a framework, Judge, we

10   believe that this victim, the two-year-old child of both

11   parents who were labor trafficked by the defendant, would

12   qualify as a victim.  First, this defendant knew that these

13   people had children.  She encouraged them to bring the kids

14   with them and then she, in fact, charged these people for

15   daycare services that she ran out of her house by her parents.

16        Second and more compelling, your Honor, is she used

17   the children as a means to control the parents.  You've seen

18   this in the statements.  She would constantly threaten these

19   people, "If you talk about what's going on in this house, if

20   you talk about the debt that you're paying me, I will have you

21   deported, and I will keep your kids here."  She used the

22   children to commit the offense.

23        Third point, your Honor, the only reason this child

24   was at home in that residence unsupervised when this accident

25   occurred was because she had both parents working in the

1   factory at that time unable to take care of him, which is

2   again the offense here. And, I mean, that is the definition

3   of proximate cause, your Honor.

4          And so if you look at the statement of Victim 9 who

5   is the child's father, he even said that day that this

6   happened, her parents were sick. They weren't able to watch

7   the kid. So he asked, "Can I please stay home and watch my

8   child?"

9          And she said, "No, you have to go to work and pay off

10  your debt." That's why the child was there unsupervised and

11  able to spill this boiling water on his head. So, yes, we

12  think that that's clearly a proximate cause of his injury, and

13  he is a victim of the offense.

14         But there's a secondary argument too here, Judge, and

15  that is even after the accident happened -- we all agree it's

16  an accident. No one is saying he was intentionally burned.

17  But even after it happened, look what she did. The child was

18  in extreme pain. And this is a guideline for the causing of

19  extreme pain. That's the definition of serious bodily injury.

20         The child is in extreme pain, and the defendant tells

21  these people, "You will not take him to the hospital. You

22  will not get him pain relievers or medical treatment" because

23  she wants to -- she knows what's happened. Her whole life,

24  this whole crime is about making sure nobody talks about

25  what's going on in the house. Nobody from the outside sees

1    these people.  That's why they have to leave through the back

2    door.  They're constantly warned, "If you tell anybody about

3    what's happening here, you will be deported, and I will keep

4    your kids."

5         So she won't let them go to the hospital because she

6    knows when you take a two-year-old child to the hospital with

7    this kind of burn, questions will be asked.  DCFS is going to

8    come to the house.  So she prevented this child from getting

9    pain relief to continue this offense.

10        So there's a whole second part of this as well.  So

11   yes --

12       (Background noise.)

13        THE COURT:  I'm sorry.  We're getting -- someone

14   might have dialed in.  We're getting sound from that dial-in.

15   So everyone who is dialed in ought to be on mute at this

16   point.

17        All right.

18        MR. PARENTE:  So yes, Judge, the government's

19   position is that this child suffered serious bodily injury and

20   was a result of this offense, and she should be held

21   accountable for this two-point enhancement.

22        THE COURT:  All right.  Thank you.

23        Mr. Rascia?

24        MR. RASCIA:  Judge, Mr. Kelly is going to address the

25   Court regarding that objection.  But I want to make an issue

1    clear with the Court as I advised Mr. Parente.  The defendant

2    has not challenged that the child was injured and that the

3    enhancement is based on the injury to the child.

4          On the issue of the medical treatment, I intend to

5    present two witnesses for the purposes of presenting character

6    reference -- evidence as to the defendant.  But if you want to

7    hear from those witnesses now, I'll certainly present them.

8    But again, we are not challenging whether or not the child was

9    injured.

10          THE COURT:  Okay.  Yes, so I think we're still

11   getting some sound.  So we're going to have to -- just give us

12   one moment as we put this on mute.

13       (Discussion off the record.)

14          THE COURT:  Back on the record.

15          If I think I need to resolve facts on that, the back

16   half of, I think, the government's secondary argument about

17   the prevention of the parents bringing the child to the

18   hospital then I'll -- we'll make a detour, but I'm not sure

19   I'm going to need it.

20          So Mr. Kelly?

21          MR. KELLY:  Thank you, your Honor.  Your Honor, the

22   most important point of law on this issue is the fact that the

23   guideline is silent.  Guideline 2H4.1 contains no definition

24   of "victim."  The sentencing commission was perfectly capable

25   of adopting and including an expansive definition of "victim."

1   They've done that in other guidelines.  They did that in

2   guideline 3A1.1 which is the other guideline at issue in

3   today's hearing.

4        So principles of lenity would suggest, and just the

5   context of the statute in that it remains silent on an

6   expansion of the definition of "victim" would indicate that it

7   should be very narrowly construed.  And as the government has

8   conceded, no one -- obviously, no one is suggesting that this

9   child was used to commit forced labor.  There simply needs to

10  be a line drawn somewhere at which the unfortunate just

11  accidents of everyday life are not within the purview of the

12  sentencing analysis.

13       So I would point out that the government's arguments

14  are incredibly fact intensive.  To point out one, the

15  statement was made that this is boiling water.  What it was,

16  was I would call it a coffee thermos with hot water that was

17  spilled.  Okay.  So that's just one factual difference; not

18  related to whether or not the injury was severe but related to

19  just the context of the injury and whether that context --

20  whether that injury -- if we are to apply the more expansive

21  view that the government has suggested, we don't see a basis

22  to apply that very expansive view, but if we are to apply that

23  and get into that factual analysis these -- these individuals

24  were not targeted because they had children.  It was simply

25  irrelevant to the alleged calculus that the defendant put in

1       place here.

2               So it was just completely ancillary that an

3       unfortunate thing happened.  No one has alleged this was done

4       on purpose.  We come back to those factual disputes about what

5       occurred afterwards, what the response actually was, what any

6       statements about the response were.

7               Those are certainly questions of fact if we even

8       reach that more expansive definition.  But I would urge based

9       on just the plain reading of this guideline that we take a

10      very narrow view that only individuals who were forced to

11      labor should be deemed victims under this guideline.

12              THE COURT:  So do you dispute that the defendant told

13      the -- I think it was Victim 8 and Victim 9 that they could

14      not take their child to the hospital?

15              MR. KELLY:  We -- we absolutely -- we dispute it.  We

16      dispute most everything the government has said in terms of --

17      more importantly, the connotations of what they've said in the

18      sense that this was -- that this was used with the intent to

19      further the scheme.  The --

20              THE COURT:  Well, I don't think that, yes, the

21      government argued that it was with the intent to further the

22      scheme so much as it was, in the government's view, necessary

23      to avoid this scheme being revealed.  So and there's a

24      difference there.

25              So let me -- again, I'm not sure, on the legal point,

1   I'll give the government a chance to address this in a moment,

2   but factually it's going to be relevant to 3553 no matter

3   what.

4       I guess I would caution that if you raise a fact

5   dispute on this and if you -- and maybe you'll just try to

6   debate whether the government has met its burden by a

7   preponderance, but if you affirmatively deny, then you could

8   jeopardize acceptance of responsibility.  So I just want to

9   caution you on that point.

10      MR. RASCIA:  Judge, may I address that point?

11      THE COURT:  Yes.  Go ahead.

12      MR. RASCIA:  Judge, I'll tell you in summary what I

13  expect the Court and the government to hear from the witnesses

14  today on that narrow point of what occurred in the aftermath

15  of the injury of the child.  And they'll address you directly.

16      And again, as far as acceptance of responsibility,

17  the defendant is not denying that this child was injured in

18  her home while in the care of her sister.  That's undisputed.

19  What you'll hear from the witnesses is that during the time

20  that the defendant's niece was watching the child, the child

21  grabbed at a cup, slammed the cup onto the table, the liquid

22  came out of the cup and splashed the child in the head and the

23  face.

24      She took immediate action to comfort the child, took

25  a clean towel, put cold water on it, started patting the

1   child's head but contemporaneous with that placed phone calls

2   to the child's mother and the child's father.  The defendant

3   was not present in the household at the time the incident

4   happened.  In fact, the defendant was in a vehicle driving the

5   child's father to his workplace.

6           Defendant's mother -- the child's mother was on her

7   way back from the workplace at the time that the incident

8   happened.  So she was closer to the Cicero residence at the

9   time of the incident than the father was.

10          When the mother of the child returned to the

11  residence, the child was turned over to the mother, and the

12  care of the child was left to the mother, the mother of the

13  injured child.  The defendant didn't arrive back at the

14  location until approximately an hour to an hour and 20 minutes

15  after the incident happened.

16          Additionally, I think the witnesses will also tell

17  you that photographs of the child when sent to the mother and

18  to the father.  The father went to work.  He didn't return to

19  the residence until his shift had ended, but the care of the

20  child was left to the mother.

21          THE COURT:  Okay.  Yes, Victim 8 says in the

22  under-oath grand jury statement, "I needed to take him to the

23  hospital, and Malinek said if I did, she would have me

24  deported.  Malinek said if I took him to the hospital, she

25  would tell the hospital that my son's injury was my fault."

1          So is that going to be disputed?

2          MR. RASCIA:  Judge, can I have a moment to speak to

3     my client?

4          THE COURT:  Yes.

5        (Discussion had off the record.)

6          MR. RASCIA:  Your Honor, my client advises that she

7     did not make those statements.  And I don't think it should

8     impact her acceptance of responsibility.  She has acknowledged

9     responsibility for the child being in her home.

10          THE COURT:  Okay.  So --

11          MR. RASCIA:  She does maintain she took no steps to

12    prevent anyone from providing medical treatment to the child.

13          THE COURT:  Okay.  So let me -- I'm just going to

14    play this out, and then we can talk about how this impacts on

15    3553.  So there is no definition for "victim" unlike in other

16    guidelines provisions or statutory provisions.  And I do think

17    the rule of lenity then starts to kick in; that is to say that

18    a victim is someone who is directly the victim of the

19    underlying offense.

20          Also, in 2H4.1 in subparagraph (b)(3), that's the

21    provision that provides for the increase based on the time

22    periods that the victim is under involuntary servitude, it

23    says, "if any victim was held in peonage or involuntary

24    servitude for," and then it has those three time periods.

25          That to me suggests that the guideline is describing

1    the victim as someone who is in peonage or involuntary

2    servitude and then the guideline says, "Now based on how long

3    they are, you can kick up the offense levels."  So I think

4    that's a textual clue that the provision is covering only

5    those who are the direct victims.

6         That is not to say that there is -- that this won't

7    be considered under 3553.  It plainly would be.  This plainly

8    has to do with the offense conduct and the defendant's

9    personal history.  And so it is -- yes, it's simply a

10    guidelines ruling.  Okay.

11         So did you want to respond to that point about B3?

12         MR. PARENTE:  No, your Honor.  And again, I think

13    your Honor points out that it's not defined.  I think the

14    Court has discretion, especially given the unique

15    circumstances here where we're talking about both parents are

16    literally at the factory being labor trafficked when this

17    happened.

18         And so I would argue that the child in that point is

19    a victim of the offense, but we completely -- if your Honor

20    wants to consider her 3553, we think this example just

21    highlights the dangerousness of this crime and the seriousness

22    of the offense.  And we understand the Court's ruling.  And we

23    will argue it under 3553.

24         THE COURT:  Okay.  So I will decline to impose this

25    in light of the coverage, the more narrow coverage of "victim"

1    under the guidelines.

2        Now, just for 3553 purposes, Mr. Rascia, I guess as I

3    was talking this through, you might very well be right that

4    it -- because it's not a guidelines issue that is in dispute

5    in terms of the aftermath that maybe it wouldn't go to

6    acceptance of responsibility in the guidelines sense, but it

7    would in the colloquial sense which is just as important under

8    3553 if the defendant expresses a remorse and so on.

9        Now, it may be that as a factual matter, the

10   conversations which are reported in the grand jury statements

11   are not ones that your particular witnesses would have been

12   present for in any event.  So right now, what you've done is

13   just proffered what your client would say.  Do you plan to put

14   her on the stand?

15       MR. RASCIA:  Your Honor, she is going to make a

16   statement to the Court today.

17       And on the particular issue of the statements to the

18   grand jury, I spent many, many hours with Ms. Malinek going

19   over all this material.  Those -- the incident that happened

20   in this case, the injury to the child, as best I can tell from

21   the information I've looked at occurred, I believe, in

22   February of 2019.

23       In the defendant's plea declaration, she did

24   acknowledge making certain statements that are similar to what

25   you've alluded to today about the threat of deportation.  And

1   she acknowledged that in her plea declaration.

2           I think one of the other things you'll hear from a

3   witness today is that when other individuals within the

4   residence needed medical treatment, Ms. Malinek took them to

5   get the medical treatment.

6           So I intend to speak to her -- if the Court would

7   allow me to again before she addresses the Court -- on the

8   more narrow issue of a commentary about deportation in

9   relation to the injury to the child.

10          THE COURT:  Okay.  And so the -- of course, the

11  defendant has a right to and, of course, will allocute.  I

12  don't normally put the defendant under oath when the defendant

13  allocutes because it's not considered substantive evidence to

14  a particular factual finding.  It's an expression of the

15  defendant's remorse, their plans for the future, and so on.

16  So it's not typically taken in that light.

17          So you will have to decide when the time comes as

18  you're presenting witnesses whether you're going to put her on

19  the stand for purposes of substantive factual testimony.  And

20  you can make that decision after talking with her sometime

21  later.

22          Okay.  So that's the decision on the proposed bodily

23  injury enhancement.  It does not apply.

24          All right.  Let's talk about 3A1.1 which is the

25  vulnerable victim enhancement.  And again, I've read through

1    the filings.  Is there anything that the government wants to

2    highlight?

3           MR. PARENTE:  Yes, your Honor, just briefly.  And

4    again, I spoke to defense counsel about this prior to the

5    hearing, but the Seventh Circuit has addressed this issue in

6    *U.S. v. Calimlim* which is 538 F.3d 706 in which they heard,

7    you know, the same argument that the defendant's making where

8    the defendant said, you know, in a forced labor case that the

9    victim being an undocumented individual is not unusual;

10    therefore, it shouldn't apply.  And the Seventh Circuit

11    expressly rejected that.  And I'm quoting, and they said:

12           "Lest there be any doubt about our position on the

13           question raised by the Calimlims, we clarify today that

14           where vulnerability is not already accounted for in the

15           guidelines, we will apply the vulnerable-victim

16           enhancement when the victim is a member of a group

17           typically vulnerable to that particular manifestation of

18           a general offense committed by the defendant, whether or

19           not the victim is otherwise unusually vulnerable.  In

20           this case, Martinez was a member of a group typically

21           targeted by those desiring forced laborers, but her group

22           (illegal aliens) is only part of the broader set of

23           possible victims.  She was therefore a vulnerable victim

24           for the purposes" of this guideline and, "The district

25           court erred when it denied the enhancement."

1          And so here, Judge, you know, focusing on Victim 10

2   first, she has a sixth grade education.  She's an undocumented

3   worker.  Ms. Malinek knew all of this.  They're from the same

4   village.  She targeted her based on those vulnerabilities, and

5   then she exploited her.  She would threaten her, "I'll tell

6   you" -- "if you leave, I'll tell Immigration on you."

7          When this victim pushed back and said, "Why is my

8   debt going up so much," and Ms. Malinek blamed the bank.  And

9   the victim asked to go to the bank.  She said, "You can't

10  speak English.  You're not allowed."  I mean, this is a

11  vulnerable victim case.

12         If you look at Victim 1, Judge, she's a 15-year-old

13  girl.  One of the factors in here is the age of the victim.

14  All of these victims share the same vulnerability, which is

15  being illegal aliens.  And the defendant exposed -- she

16  exploited that.  And Victim 1 specifically was 15 years old,

17  and the defendant exploited that.  All of these victims had

18  education levels of second, third, fourth grade.  The

19  defendant exploited that.

20         So we think based on the Seventh Circuit's decision

21  in *Calimlim* as well as just the fact that your Honor is aware

22  of that this vulnerable victim enhancement should apply here.

23         THE COURT:  Okay.  Mr. Rascia?

24         MR. RASCIA:  Your Honor, Mr. Kelly is going to

25  address you on that point.

1      THE COURT:  Okay.  Mr. Kelly?

2      MR. RASCIA:  If the Court allows.

3      THE COURT:  All right.  Go ahead.

4      MR. KELLY:  We would like to rest on the arguments in

5  our pleading with the exception, I would like to add some

6  argument addressing *Calimlim*.  We don't believe that that case

7  is controlling in the sense that it alleviates us of the

8  obligation to do some analysis here.  The appellant in

9  *Calimlim* --

10      INTERPRETER CARBAJOSA:  Pardon me, your Honor.  The

11  interpreter is having a hard time hearing.

12      THE COURT:  Yes, if you could just pull the

13  microphone --

14      INTERPRETER CARBAJOSA:  There is a muting factor that

15  the masks have which takes us an additional half a second to

16  hear what is being said --

17      THE COURT:  Okay.

18      INTERPRETER CARBAJOSA:  -- and understanding.  Thank

19  you.

20      MR. KELLY:  Your Honor, the appellant in *Calimlim*

21  took very broad claim of error saying that as formulated by

22  the Court that no victim in a forced labor prosecution

23  could -- that would be double counting in every case because

24  they're necessarily vulnerable victims.  That's not our

25  argument.  Our argument is fact-intensive in the sense that we

1    have to determine, if we're going to make categorical

2    statements that certain groups are automatically vulnerable

3    victims, we at least need to make factual findings about

4    whether these people fit in that group.

5           So we point out that the only -- the only available

6    factual basis to meet the element of coercion is the

7    immigration status.  So that is distinctive, our argument is

8    distinctive from the argument raised in *Calimlim* for that

9    reason.

10          But then I would also point out that the statement

11   which was -- the statement of law which was just made by the

12   government, even if we accept it as binding and not some sort

13   of victim, refers to illegal aliens.  I don't like the term

14   "illegal alien."  I prefer the term "undocumented immigrant"

15   as the government chose to use.  But these were asylum

16   seekers.

17          So just as purely as a matter of law, we would be

18   outside of the directly controlling limitations of *Calimlim* in

19   that.  We would -- we would just urge the Court that we

20   believe we shouldn't make these generalizations that all

21   foreign nationals are vulnerable, that all -- you know, these

22   were asylum seekers.  They were regularly inspected by the

23   immigration authorities.

24          I point to the statement in the probation report

25   which says that they were vulnerable for fear of being

1    identified by Immigration.  That's just not applicable here

2    where Immigration was regularly appearing, inspecting, and

3    monitoring their status as asylees.

4         So I would just make the point resting on our

5    filings, we're making the point that we're not controlled by

6    *Calimlim* in that respect because these were not, to use the

7    phrase, illegal aliens and for the other reasons I have stated.

8         THE COURT:  Okay.  Yes, I think here the enhancement

9    does apply.  The government has shown this both as a matter of

10   law and factually.  In terms of the legal premise, the cases

11   that you had cited in your briefs, the Fifth Circuit cases,

12   obviously are much farther away in relevance than the *Calimlim*

13   case which the government has cited.

14        So first, you did argue in your brief that those who

15   are aliens to the United States should not be considered

16   vulnerable victims because there's some sort of incorporation

17   of that status into Section 1589 of the offense itself.  And

18   that's just not accurate.  Section 1589 does not necessarily

19   refer to immigration status.

20        And the two Fifth Circuit cases that were cited in

21   the brief which were *United States v. Medina-Argueta*, 454 F.3d

22   479 at Page 483, and *U.S. v. Angeles-Mendoza*, 407 F.3d 742 at

23   Pages 747 and '48, those two Fifth Circuit cases were alien

24   smuggling cases.  So the alien status of the victims was

25   indeed incorporated into 8 USC 1324.  So that's not the

situation with 1589.  So as a matter of law, it can very well
encompass immigration status as part of the vulnerability of
the victim.

And the victims who worked under the fraudulent
identification documents, they were susceptible to deportation
because they were using fraud documents to work that -- and
fraud documents that the defendant procured in order to then
obtain funds from them for the purported debts that they owed
her.

So I do believe that 3A1.1, it can cover, in the
appropriate case, immigration status, and it does here because
of the numerous victims who were working under fraudulent
documents.

Also, the PSR cited their deep and intense poverty,
that is, the poverty of the victims, which led them to have
very little choice and to be especially vulnerable.  And I
think that applies as well here.

The grand jury statements are very specific as to
each victim in terms of how much they would have left over,
most of them saying that they had very little left over after
each week when they had to pay the defendant.  Victim 10, for
example, said that she, after paying the defendant, was left
with maybe $150 per week; Victim 9 similarly, around $130 per
week after the defendant took wages from that person, and so
on.  And so I think that made them especially vulnerable as

1   well because they had no choice and no means to escape the

2   defendant's threat of deportation.

3           And I also note here that the defendant, according to

4   the grand jury statements, did make these deportation threats

5   with respect to the children staying in the United States

6   while the parents would be deported.  And that was reported by

7   Victims 2, 3, and 4.  So and really, that's just kind of the

8   cherry on top.  The other facts support the vulnerable victim

9   enhancement without that.  So this two-level increase does

10  apply.

11          So with that calculation, we're left with a total

12  adjusted offense level, assuming acceptance of responsibility

13  still ends up applying, of 26, criminal history category I,

14  which is 63 to 78 months.

15          Okay.  So let's now move on to 3553 arguments.  And

16  we can start with the government.  And whenever you want

17  during your presentation to present the victim witnesses, you

18  can go ahead and do that.  I'll note for the record that the

19  victims are being referred to by numerical designations that

20  they've carried throughout the entire case and that the -- I

21  assume that the defense counsel has had these designations

22  since the beginning of the case.

23          MR. RASCIA:  In various documents, they've been

24  referred to by numbers and letters.  But I think based on the

25  last chart I received from Mr. Parente, I have no issue

1    identifying who No. 1, who No. 2 is.  And I don't intend to

2    refer to any of them by name other than by their number and

3    perhaps, as I mentioned earlier, "mother of the child" or

4    something of that nature.  But we're not -- we do not intend

5    to address anyone by their name.

6              THE COURT:  All right.  Very good.

7              Okay.  Mr. Parente?

8              MR. PARENTE:  Thank you, Judge.  And with the Court's

9    indulgence, the way we'd like to proceed is do the victim

10   impact statements first, and then I'll do my argument.  And

11   the way we have this set up -- and again, this is, we'll see

12   how well this works -- Victim 10 would like to go first by

13   phone.  And then after Victim 10, we'll have Victims 4 and 5

14   either by phone or video, depending on the capabilities, and

15   then Victim 8 by phone.

16             And then the next three statements by Victims 9, 7,

17   and 2, the Court has -- or the victims have requested that I

18   read them to your Honor.  With the Court's permission, I spoke

19   to defense counsel, I would request the ability to do that.

20             THE COURT:  Okay.  Very well.  So okay.  Let's try

21   Victim 10 by phone first.  So she can unmute herself.

22             VICTIM 10:  (Speaking in Spanish.)

23             THE COURT:  Okay.  So --

24             THE CLERK:  She's on video.

25             THE COURT:  Let's go off the record for a second as

1    we deal with this.

2         (Discussion had off the record.)

3              THE COURT:  Let's go back on the record.

4              Okay.  So we do see her, Victim 10, on the bottom of

5    the display, and we can also hear her.  And then for the

6    record, she is speaking in Spanish, and the interpreters will

7    be rendering.

8              Okay.  So let's put Victim 10 under oath, Mike.

9              THE CLERK:  If you would please raise your right

10   hand.

11        (Witness sworn through the interpreter.)

12             VICTIM 10:  I do.

13             THE CLERK:  Thank you.

14             THE COURT:  All right.  Mr. Parente?

15             MR. PARENTE:  Okay.  Ma'am, can you please tell the

16   Court how this crime has affected you?

17             VICTIM 10:  Yes.  Very good afternoon to everybody.

18   First, I would like to say that I filed this report many years

19   ago, and the motive being that I was very affected by all

20   this.  I brought my family here to this country.

21             So when I arrived, everything was fine.  And, you

22   know, she told me that I had to pay for the trip.  And I had

23   no problem with that.  I didn't oppose it.

24             So when I became bothered by this was that I owed

25   $12,000.  And there was a problem that I had with her niece.

1        So I decided to leave the house.  And she said that
2   if I left the house that she would threaten me to Immigration.
3        So then because I didn't want to go back to her
4   house, she said that I had to pay back to her 23,000-
5   something.
6        So then she said that because I was not going to live
7   under her roof that the bank had told her that I would have to
8   pay the interest of that money.
9        So then I told her that I wanted to speak to the
10  manager of the bank to know why they were charging me that
11  money.
12        So she said no one speaks Spanish over there.  So I
13  said, "Well, how would that be possible?  There's always
14  somebody everywhere that speaks Spanish."
15        So then I returned to her house.  She said she had
16  gotten me a job of $17 an hour so that I could return her
17  money soon.
18        But I think that it was all trying to fool me because
19  when we got to the work, to the job, they needed somebody who
20  spoke English.  And I had just arrived to the country not long
21  before.
22        So then I returned to the -- to her house, and I
23  stayed there.  So I asked her, "Well, now that I'm living in
24  your house under your roof, do I still have to pay the same
25  quantity?"

1        So I stayed in her house until I finished paying her

2   because she said I could not leave her house until I finished

3   paying her money.

4        So then I finished paying her money, and that's when

5   I left, like in May of 2013.  That's when I left.

6        And actually, even on the last day that I was there,

7   she wanted to charge me 500 additional dollars for damage she

8   said to the room where I was staying.

9        And so that's what happened.  And that's the most

10  important thing.  And that's why I filed a report against her.

11       So I thought -- and the reason I did that is because

12  I thought it was unjust, you know.  I had no problem paying

13  for money.  I felt I had not spent that money.  I had no

14  problem paying for rent or food or things that I was

15  responsible for.

16       And so that's everything but, you know, there's a lot

17  of things that happened over there but, you know, we would not

18  be able to finish today.  So that's the reason I filed the

19  report.  It was because of the money.

20       MR. PARENTE:  And I wanted to thank you, ma'am, for

21  sharing your story with us today.

22       Is there anything else that you want to tell the

23  judge today kind of about what happened to you that's

24  important to you that you'd like to state?  If so, now is your

25  time.

1     VICTIM 10:  Well, that's all I have to say.

2     MR. PARENTE:  And we thank you for your time, ma'am.

3     VICTIM 10:  Thanks to you.

4     THE COURT:  Okay.  Mr. Parente, the next one.

5     MR. PARENTE:  Yes, your Honor.  And just so the Court

6  has context, Victim 10 was the first victim.

7     THE COURT:  Yes, I understand.

8     MR. PARENTE:  And she reported the -- she reported it

9  to the FBI in 2014, and then that kind of led to this

10 investigation.

11    THE COURT:  Yes.  It's in the PSR.  I understand.

12 Thank you.

13    MR. PARENTE:  And at this point, we'll ask Victims 4

14 and 5 who I believe are together, your Honor.

15    THE COURT:  Okay.  Yes, please do prompt them one at

16 a time, though.  All right?

17    MR. PARENTE:  Correct.

18    THE COURT:  Yes.

19    UNIDENTIFIED SPEAKER:  I'm sorry.  I have another

20 call.

21    (Pause.)

22    VICTIM 3:  Hello.  Good afternoon.

23    MR. PARENTE:  Good afternoon, sir.  Thank you for

24 joining us.  And my name is Chris Parente.  We met before.  I

25 know you can't see me, but as we discussed previously, this is

1   your chance to tell the Court about your experience and what

2   happened to you.  So whenever you're ready, I'd ask that you

3   please start.

4           And I apologize, Judge.  Do you want him under oath,

5   your Honor?

6           THE COURT:  Yes.  So we'll ask that in a moment.  Can

7   you tell me what the number designation of this person is?

8           MR. PARENTE:  Yes, your Honor.  This is Victim 3.

9           THE COURT:  Okay.  All right.  I'll ask the courtroom

10  deputy to put Victim 3 under oath.

11          THE CLERK:  If you would please raise your right

12  hand.

13      (Witness sworn through the interpreter.)

14          VICTIM 3:  I do.

15          THE COURT:  All right.  Mr. Parente, you can proceed.

16          MR. PARENTE:  Thank you.

17          Sir, you can begin whenever you're ready.

18          VICTIM 3:  Well, when I lived with Ms. Malinek

19  personally, the time that I lived with her, the truth is, I

20  don't feel well because of what she did to us because she

21  would abuse us in different ways.  She would -- she would tell

22  us off every week.

23          INTERPRETER CARBAJOSA:  The interpreter is going to

24  instruct him to pause so it's not awkward, your Honor, if

25  that's okay.

1          THE COURT:  Okay.

2          INTERPRETER CARBAJOSA:  Pause every few seconds.

3          THE COURT:  Yes, please.

4          VICTIM 3:  So when she would finish talking to us,

5    she would say, "If somebody asks how you're all living in my

6    house, you all have no right to give information.  If somebody

7    listens, speaking badly about me or giving information how

8    you're living in my house, I will send you all out but without

9    the children," she'd say, "because you are not in your

10   country, and nobody can help you," she would say.

11          That's why we are scared, that our children are

12   taken.  One cannot live without children.  This also affected

13   me a lot because of my son because she said the children

14   cannot go outside because the police will take them away, and

15   you will no longer have children.  That's why my child would

16   feel very sad when hearing those words, being locked up in the

17   house but in darkness because the lady would not allow the

18   lights to be turned on inside the house because according to

19   her, the electricity was cut off.

20          And one day the toilet became stuck, and the house

21   became full of disgusting things.  The smell was unbearable.

22   We could no longer eat, bathe, at ease.  We were like that for

23   six days.  It really affected us a lot, but she didn't care.

24   What she said was we are guilty because the toilet became

25   plugged up.  We could not reply or explain because the lady

1    would get angry, and we didn't want to argue.

2         So I have never forgotten what happened with this

3    lady.  I also became traumatized because I was scared.  I am

4    also scared because of my family, because she's saying that

5    one day she's going to leave the place that she's at and she's

6    going to have her vengeance.  That's all.  Thank you.

7         MR. PARENTE:  Thank you, sir.  I appreciate your

8    willingness to share your story with us.

9         THE COURT:  Mr. Rascia -- Mr. Rascia, do you have any

10   questions?

11        MR. RASCIA:  I do have a question.

12        THE COURT:  Okay.  And I didn't ask you about for

13   Victim 10.  Did you have a question for her?

14        MR. RASCIA:  I did not.

15        THE COURT:  Okay.  So actually, if you can have -- I

16   think he might have just left, so if you can alert him to

17   return to wherever he was sitting.

18        INTERPRETER O'HANLON:  Your Honor, may the

19   interpreters change?

20        THE COURT:  Yes, of course.  Thank you.

21      (Pause.)

22        THE COURT:  Okay.  There he is.  Go ahead,

23   Mr. Rascia.

24        MR. RASCIA:  Sir, since the time that Ms. Malinek was

25   arrested, have you had a conversation with her directly?

1          VICTIM 3:  No.

2          MR. RASCIA:  Judge, I don't have any further

3   questions.

4          THE COURT:  All right.  Mr. Parente, do you have any

5   questions, follow-up?

6          MR. PARENTE:  Sir, you mentioned that you're scared

7   because one day, she's saying that she'll get out and have her

8   vengeance.  Why do you say that?

9          VICTIM 3:  Yes.  Yes, it's the truth, yes.

10         MR. PARENTE:  And what is that based on?  Why do you

11  think that?

12         VICTIM 3:  Well, because of the way she is.  I mean,

13  it's really hard to describe, but I lived with that lady.

14         MR. PARENTE:  Thank you, sir.

15         THE COURT:  All right.  Anything else, Mr. Rascia?

16         MR. RASCIA:  Please, your Honor.

17         THE COURT:  Okay.

18         MR. RASCIA:  Sir, to be perfectly clear, Ms. Malinek

19  never said to you directly that when she gets out of jail,

20  there will be consequences?

21         INTERPRETER O'HANLON:  Your Honor, may the

22  interpreter ask the witness to speak closer to the microphone

23  again?

24         THE COURT:  Yes, please.

25         VICTIM 3:  Well, yes.  The truth is that she has

1    family in Guatemala, so that is what I've heard.

2              MR. RASCIA:  But you didn't hear that directly from

3    Ms. Malinek, did you?

4              VICTIM 3:  No, just through her family.

5              MR. RASCIA:  Did you speak directly to a member of

6    Ms. Malinek's family?

7              VICTIM 3:  No, not that either, but my mother was

8    telling me that.  So that's why I'm afraid up until now.

9              MR. RASCIA:  I don't have any further questions, your

10   Honor.

11             THE COURT:  Okay.  Anything else, Mr. Parente?

12             MR. PARENTE:  Sir, your mother still lives in

13   Guatemala?

14             VICTIM 3:  Yes.

15             MR. PARENTE:  And this is information your mother

16   heard in Guatemala?

17             VICTIM 3:  Yes.

18             MR. PARENTE:  Nothing further.  Thank you, sir.

19             THE COURT:  All right.  Anything else, Mr. Rascia?

20             MR. RASCIA:  No, your Honor.  Thank you.

21             THE COURT:  Okay.  We'll hear from, is it Victim 4

22   next?

23             MR. PARENTE:  Correct, Judge, on the same line here.

24             THE COURT:  All right.

25        (Pause.)

1          THE COURT:  All right.  You can go ahead.

2          MR. PARENTE:  Good afternoon, ma'am.  My name is

3    Chris Parente.  We met before.  I know you can't see me, but

4    thank you for being here today.

5          THE COURT:  Let's --

6          MR. PARENTE:  Can we translate that?

7          THE COURT:  Was that translated?

8          INTERPRETER O'HANLON:  It was, your Honor, to the

9    defendant.

10          INTERPRETER CARBAJOSA:  The interpreter Jorge

11   Carbajosa interpreted directly to the witness.  I believe

12   that -- but go ahead, counsel.

13          THE COURT:  Okay.  And let me just -- is there an

14   interpreter with them?

15          MR. PARENTE:  No, your Honor.

16          THE COURT:  Okay.  All right.  And then let's put the

17   witness under oath.

18       (Witness sworn through the interpreter.)

19          VICTIM 4:  I swear.

20          MR. PARENTE:  Thank you, ma'am, for joining us.

21   Again, my name is Chris Parente.  We met before although you

22   can't see me.

23          And ma'am, this is your opportunity to tell the Court

24   as we discussed how this crime has affected you.  So whenever

25   you're ready, please begin.

1      VICTIM 4:  It has affected me a lot.  I am a survivor

2  of human trafficking.  And it's very hard to tell what I lived

3  through and my family.

4      Well, I personally, it has affected me a lot.  I

5  don't go out, and I don't have any friends.  I feel very

6  afraid, and that fear follows me wherever I go because the

7  lady has threatened us that wherever we go, Guatemala or

8  somewhere else, she is going to have her vengeance because

9  we're the ones that are guilty for her going to jail.

10      Because when we were living in her house, she said

11  that we had no reason to be giving information to anyone

12  because we had no right to tell anyone how we were living.

13  Even when I came to the United States, she humiliated me.  She

14  said things to me that really affected me personally.

15      In fact, when I would leave my daughter to go to

16  work, my daughter would cry, and she would tell me that the

17  lady was very bad.  She would tell me that she wanted to go

18  back to Guatemala because she was not the playful child

19  anymore.  The lady would lock her in there.  That playful girl

20  that I knew was completely changed.  She said that she would

21  be locked in the dark, and it was like hell in there, and she

22  didn't like that.

23      And one time I came back from work, and they were all

24  at the house.  And I found her crying.  And she said that the

25  lady had humiliated her from what she said to her.  In fact,

1   my oldest son would feel very afraid when he went outside.

2   She would tell him that if he went outside, someone would hurt

3   him, he would get hurt.  So that's what the lady would say to

4   the children so they wouldn't go outside.

5        It's the biggest fear that I have now.  I'm very

6   afraid, not so much for myself but for my children and also

7   for my family back in Guatemala.  That's all I wanted to say.

8        MR. PARENTE:  Thank you, ma'am, for sharing your

9   story with us.  And defense counsel is going to ask you a few

10   questions.

11        MR. RASCIA:  Good afternoon.  Your husband came to

12   the United States and began to live with Ms. Malinek in April

13   or May of 2018, correct?

14        VICTIM 4:  Uh-huh, that's correct.

15        MR. RASCIA:  And you came to live in Ms. Malinek's

16   home in February of 2019, correct?

17        VICTIM 4:  Correct.

18        MR. RASCIA:  And in March of 2019, at the end of

19   March, Ms. Malinek was arrested, correct?

20        VICTIM 4:  Yes.

21        MR. RASCIA:  From the day Ms. Malinek was placed

22   under arrest, have you had a conversation with her since that

23   time?

24        VICTIM 4:  No.

25        MR. RASCIA:  Your Honor, I have nothing further.

1      THE COURT:  All right.  Any other questions,
2  Mr. Parente?
3      MR. PARENTE:  No, your Honor.
4      THE COURT:  Okay.  You are excused as well.
5   (Witness excused.)
6      THE COURT:  All right.  Mr. Parente, do you have one
7  more person to present?
8      MR. PARENTE:  Yes, your Honor.  This one will be just
9  by phone.  It's going to be Victim 8.  I'll approach your
10  deputy with permission.
11      THE COURT:  All right.
12   (Pause.)
13      THE COURT:  Yes.  So Victim 8 can unmute herself
14  whenever she's ready to go.
15      VICTIM 8:  Hello.  Good afternoon.
16      THE COURT:  Okay.  This is the judge.  We do have to
17  put you under an oath to tell the truth.
18      So I'll ask the courtroom deputy to do that now.
19      THE CLERK:  If you could please raise your right
20  hand.
21   (Witness sworn through the interpreter.)
22      VICTIM 8:  I do.
23      THE COURT:  All right.  Mr. Parente?
24      MR. PARENTE:  Thank you, Judge.
25      Ma'am, my name is Chris Parente.  We met before.  I'm

1   the prosecutor on the Malinek case.  And as we spoke about

2   before, this is your opportunity to let the judge know how

3   this crime affected you.  So whenever you're ready, please

4   begin.

5           INTERPRETER CARBAJOSA:  The interpreter said, please

6   allow me a pause after every few sentences so I can translate.

7           VICTIM 8:  Yes.  Thank you so much for having me --

8   for having given me this opportunity to make my statement.  I

9   was born in Bartolomé de las Casas in Guatemala.  I was in

10  school up to the seventh grade.

11          INTERPRETER CARBAJOSA:  The interpreter is going to

12  ask her to repeat.  She's not coming out very loudly.

13          THE COURT:  All right.  Sure.

14          VICTIM 8:  I had a relationship with a person who

15  also lived in the house, Concepcion's house.  And we have two

16  children.  It was very difficult for me to speak and to make

17  my statement, but I also want justice to be done the way it

18  should be.

19          I am very fearful for my family in Guatemala because

20  the family of Ms. Malinek has said that the things that have

21  happened and the death of her parent will not remain like that

22  and that they will see that justice is made.  They said that

23  the death of her parent was a pain that Ms. Malinek had to go

24  through while she was in jail.  That's why they said they're

25  not going to remain with their arms crossed.

1         The truth is, I never imagined that my family and I,

2    that we were going to be victims of human trafficking.  When I

3    left Guatemala with the hope of being with my -- with my

4    partner, I thought I was going to arrive to the house of

5    somebody who would be kind and somebody who was respectful,

6    but that's not the way it was.  And I felt very badly because

7    I never wanted my family to know what was happening.  I only

8    wanted a better life and a better future for my child.  But

9    while I was at Malinek's house, I never thought that those

10   things were possible, that they would happen.  I thought my

11   life would remain like that, devastated.

12        Since Ms. Malinek was controlling us and even after

13   we were rescued from her house, I have not been able to live

14   my life.  Sometimes I start to think what I went through in

15   Malinek's house and how difficult it was.  Ms. Malinek would

16   always intimidate by the way she spoke to us.  She would

17   always say that we were useless people, that we knew nothing

18   and that nobody would care whatever would happen to us because

19   we are some immigrants and that she's the one that decides

20   what we have to do.

21        One time we told her we wanted to travel to Florida,

22   and she said that if you wanted to move to a different state

23   that we would have to sign some papers with them to make sure

24   that we would pay her or otherwise, she would report us to

25   immigration and she would deport us.

1          We just wanted to leave as soon as possible from

2   Ms. Malinek's house.  We could no longer bear the conditions

3   that Ms. Malinek made us live in.  We were like 43 people in

4   that house, and there were only two bathrooms and two --

5          INTERPRETER CARBAJOSA:  The interpreter here.  The

6   interpreter would ask her to repeat.  "Whenever people

7   would" --

8          VICTIM 8:  Two kitchens.

9          We did not have a personal bathroom.  It was very

10  difficult to use the bathroom and the kitchen with so many

11  people.  Sometimes we would go to work without food because

12  there was very little space.  And then my son got burnt, his

13  head, in the head, when I was at work.

14         I just wanted to leave Ms. Malinek's house.  I could

15  no longer take it.  I felt a strong pain because of my son and

16  also a great fear of losing him.  Ms. Malinek told me that if

17  I took him to a clinic that he would be taken away from me and

18  that I would be deported and that I would never see my son

19  again.  Malinek said it was my fault and that she was going to

20  tell the authorities what happened.  I could not understand

21  how it could be my fault if I was at work.  So because of the

22  fear, I didn't take my son to a clinic.

23         So now my partner and I, we try to make it through,

24  go on with life, but it's impossible to forget what we went

25  through because of Ms. Malinek.  I don't know what would be of

1    us if we still were with her.  I don't know what would be of

2    my two children.  She is very aggressive.  I am very grateful

3    for the detectives for the help that they provided to us to be

4    able to escape from the house.

5              MR. PARENTE:  Ma'am, are you still there?

6              VICTIM 8:  Yes.

7              MR. PARENTE:  Is there anything else that you wanted

8    to say to the Court, or was that the end of your statement?

9              VICTIM 8:  I just want to add many thanks.  Thank you

10   so much for the help that you gave us.  I would not know how

11   to pay you back.  I am very grateful for the help that was

12   provided to us by the authorities and by lawyers.

13             MR. PARENTE:  Ma'am, and I thank you for sharing your

14   statement.  At this point, I think defense counsel will

15   probably ask you a few questions if that's okay.

16             INTERPRETER CARBAJOSA:  The interpreter didn't hear

17   that.

18             VICTIM 8:  What?

19             MR. PARENTE:  Ma'am, the defense attorney, I believe,

20   has a question or two for you.

21             VICTIM 8:  Okay.

22             MR. RASCIA:  Good afternoon.  Ma'am, prior to

23   arriving at Ms. Malinek's residence, is it true that you spent

24   five months in immigration custody in Texas?

25             VICTIM 8:  Yes.

1        MR. RASCIA:  Ma'am, you testified about being told

2   about Ms. Malinek's family or a family member not sitting with

3   their arms folded over the death of Ms. Malinek's parents.

4   Did someone say that directly to you?

5        VICTIM 8:  Not directly, but when her parents died,

6   Ms. Malinek's parents, my mother went over there to express

7   her condolences, and they started to say that behind her back,

8   so they did directly to her.

9        MR. RASCIA:  Well, Ms. Malinek, the defendant in this

10  case, she never said any of those things to your family, did

11  she?

12        VICTIM 8:  No, no, no.  I have not heard anything

13  coming out of her mouth from her.

14        MR. RASCIA:  How long did you actually live in

15  Ms. Malinek's residence?

16        VICTIM 8:  Five months.

17        MR. RASCIA:  Thank you.  I don't have anything

18  further.

19        THE COURT:  All right.  Anything else, Mr. Parente?

20        MR. PARENTE:  No, your Honor.

21        THE COURT:  Okay.  You are excused.

22     (Witness excused.)

23        THE COURT:  All right.  Anyone else to present,

24  Mr. Parente?

25        MR. PARENTE:  Judge, just the three witnesses who

1    requested that we read their statements to your Honor.

2         THE COURT:  Okay.  Why don't you go ahead and do

3    that, and then we'll take a break after that.

4         MR. PARENTE:  Okay.  Thank you, your Honor.  And for

5    record, this will be Victim 2's statement to the Court.

6         INTERPRETER CARBAJOSA:  May the interpreter have

7    access to those statements so we can read along?

8         THE COURT:  Yes.  Do you have an extra copy?

9         MR. RASCIA:  Judge, I think I do.

10        THE COURT:  All right.  Thank you, Mr. Rascia.

11        MR. PARENTE:  "My name is Victim 2.  I was born in

12            Fray Bartolomé de las Casas, a small town in central

13            Guatemala.  I attended school through the fourth grade,

14            then started working to earn money for my family.  I have

15            been married to my wife for nearly 20 years and together,

16            we have three children.

17                 "I fled Guatemala to seek better opportunities for my

18            daughter and to try to find a way out of Guatemala's

19            constant danger.  However, when I arrived, Ms. Malinek, a

20            woman from our community, forced my daughter and me into

21            a trafficking situation.  Having to live a trafficking

22            experience was hard and something I don't wish for

23            anybody, but I focus on the now.  Trying to talk about

24            this is difficult for me, but I want to make sure

25            Ms. Malinek does not do this to anyone else, so I will

1    tell you what I can.

2         "My daughter is still a minor.  She doesn't want to

3    talk about it anymore.  She wants to be young and to

4    study.  I couldn't control what happened to her during

5    her trafficking, but I can protect her here.  This is why

6    she is not talking at this hearing even though she has

7    suffered very greatly.  She just wants to move on.

8         "This case is very hard for us.  Sometimes it feels

9    like we are still in the middle of everything.  While we

10   were in Malinek's house, I was always uncertain of what

11   would happen and how it would all end.  It still feels

12   this way.  I feel like I have been in this for too long.

13   I feel like I cannot leave the trafficking behind, like

14   I'm still not free.  I just want this all to be over.

15        "It has been a slow recovery of my trust in people.

16   My character with new people has changed.  I don't trust

17   like I used to.  I used to find the rhythm of work easily

18   and could adapt to change quickly.  It's harder for me to

19   make change now.  I am someone who likes teamwork, to

20   come to an accord with the people I work with, but now it

21   feels like I do this less.

22        "My communication with each person is hard work now.

23   I just feel like things are different.  Nothing feels the

24   same.  Ms. Malinek asked me for more and more money, and

25   I made a lot of debt in Guatemala because of this.  At

1    first I thought I could still trust her.  I believed what

2    she said.  It never occurred to me I could not believe

3    her or that she would charge me more money than was fair

4    because she was known to me.  It is very difficult now.

5    I often think about this.

6          "She was not who I thought she was.  She acted like I

7    didn't know anything and like she just didn't know I had

8    the same rights as another human.  I feel that she

9    treated me like that because I have no education or

10   resources.  Now I know I have to really analyze people

11   before I trust them.

12         "When my daughter and I started to live at

13   Ms. Malinek's house, it felt like she had control over

14   us, and the only thing I could do was obey her rules.

15   Ms. Malinek told me I owed her so much more money than we

16   had agreed for no reason.  I relied on her, and I felt

17   like I had no choice.  She had all the control, and I

18   felt powerless.  We were truly trapped.

19         "I felt that Ms. Malinek took considerable advantage

20   because I did not know how the situation was in the

21   United States.  I still think about this time and how I

22   had no control over our lives.  My daughter was alone a

23   lot, and when she was not alone Ms. Malinek would treat

24   her really badly.  Then she started talking about how my

25   daughter should sleep with her cousin, an adult woman.  I

1     learned later that my daughter was made to sleep in the

2     same bed as this woman.  I lament that this happened.

3          "I brought her here for good future, and when all

4     this happened, I felt so bad for bringing her.  I was so

5     upset and worried, and my daughter cried every day.  When

6     Ms. Malinek told me that my kid could not go to school

7     and that she had to start -- she had to work to pay for

8     the debt, it was a breaking point for me.  I intended to

9     work for my kid and give her a good education.

10          "I got very depressed after that.  I felt guilty.  I

11    became preoccupied with my kid's physical and emotional

12    health.  The few chances I would get to see her, my

13    daughter would blame me for leaving her alone and having

14    permitted Ms. Malinek to separate us.  Seeing my kid sad

15    distressed me every time.

16          "I still do not like to think about this.  It was a

17    terrible time.  Watching my daughter try to recover from

18    this and knowing that I could not protect her from

19    Malinek has impacted my life.  I felt so sad.  I did not

20    know what to do.  I couldn't do anything because we were

21    in her house, and she had told me that if I were

22    deported, my daughter would stay here with her.  I knew I

23    could not risk leaving my daughter with Ms. Malinek.

24          "I spent so much time feeling so sad and preoccupied

25    with what to do with this that I became hopeless.  My

1     daughter and I lived in fear of being detained by police

2     and the immigration officers because of Ms. Malinek's

3     threats.

4          "I will never forget how it felt to leave that place

5     finally.  We sometimes talk about what could have

6     happened, and we give thanks to God that we are not there

7     now, that people came and took us out of there.  I think

8     my daughter is recovering, and now she is working on her

9     studies.  I feel relief for her, and I continue trying to

10    make her life better.  Now that we have both gone through

11    this, she is more adult than she was.  She often has a

12    say in our life that she didn't before.  If no one had

13    come, we might still be there, my daughter would not be

14    able to study.

15         "Now I worry all the time about my family in

16    Guatemala.  We are still dealing with the case, the fear

17    of what Ms. Malinek or her family in Guatemala could do

18    to my wife and sons.  I am afraid to return to my home

19    where my family is, and every day I worry that something

20    could happen.  I often worry that supporting this case is

21    putting them in more danger.

22         "I do not want what happened to me to happen to

23    anyone else.  I was so thankful to Malinek at first.  She

24    seemed like she was helping me but with time, I saw that

25    she had trapped my daughter and me.  That time and the

1    sadness I felt stays with me.  It has changed and harmed

2    all of us.  She used my daughter and me.  She stole time.

3    She threatened, traumatized, and humiliated my daughter.

4    I still fear of her power and her threats over my family

5    and me.

6         "I am giving this statement because I feel like it is

7    important to tell what happened to me, what happened with

8    her.  I could not say what I have not lived or seen with

9    my own eyes, but I do have to tell the truth, and this is

10   the truth."

11        And just for the record, Judge, that's Victim 2, the

12   father of Victim 1.

13        THE COURT:  All right.

14        MR. PARENTE:  The next statement, your Honor, is by

15   Victim 7:

16        "I am one of those affected by Mrs. Concepcion

17   Malinek, and this is my declaration about what happened.

18   I didn't want to be in court because I don't want to have

19   to see her again and be reminded of what I had to live

20   through in her house.  I also think about my family in

21   Guatemala.  The majority of her family is in Guatemala,

22   and this could cause a problem for my family who lives

23   there now.  If something happened to them in the future,

24   I wouldn't forgive myself:

25        "When I arrived in the United States, I didn't know

1  anyone.  I didn't have family, and I felt completely

2  alone.  I had left Guatemala for the opportunity to help

3  my family get ahead in life.  I had to take out a loan

4  with interest to pay for my trip to the United States.

5  As soon as I left Guatemala, the interest started to

6  accrue.

7  "Ms. Malinek promised that I would have a good job

8  and life in the United States, but when I arrived in her

9  house, I realized this was a lie.  From the first day

10  with Ms. Malinek, I had to pay.  This made me feel

11  stressed and disillusioned.  It was a lot of pressure.  I

12  didn't sleep well because I was thinking, 'What am I

13  going to do?  I don't know this country, this city, or

14  where I am.'

15  "I only hoped that I would find a solution to all of

16  this.  Ms. Malinek wanted the money.  She demanded that

17  we pay her as soon as possible.  She told me things like,

18  'So long as you don't pay me down to the last cent, you

19  can't leave here' and, 'You'll be free when you pay off

20  the balance with me.'

21  "I told her that I had family in Guatemala that I

22  needed to support while I was in the United States, but

23  she didn't care about my situation.  The only thing she

24  cared about was that you pay her.  'You're already here,'

25  she would say, 'and you already left your family behind.'

1        "I arrived with a lot of excitement and motivation to

2     work, but when I saw how things were, I thought I would

3     never be able to support my family like I planned because

4     I would always be paying a debt.  Sometimes I couldn't

5     send money to my family or pay the interest on my debt in

6     Guatemala because I had to pay the debt to Ms. Malinek

7     first.  The little that I earned, and it was not a large

8     amount, the majority of it went to her.  This caused

9     financial stress, and it was difficult for me to

10    concentrate.  There was no way to escape it.  I had debt

11    here, debt in Guatemala, and I had to send money back

12    home to support my family.

13      "My wife was very sad and felt let down by me.  She

14    said it would have been better if I never left.  I felt

15    the same.  All of this affected the relationship with my

16    family.  At the beginning, they didn't understand what I

17    was experiencing here.  They thought I was living a good

18    life in the United States.  I was two months behind on my

19    interest payments in Guatemala because after I paid my

20    debt to Malinek, I didn't have any money left.

21      "The person who I owed money to in Guatemala put

22    pressure on my wife because she lived there.  My wife

23    didn't understand why I couldn't pay the debt.  It was

24    uncomfortable.  We didn't understand each other, but

25    little by little, she began understanding what was

1    happening here.

2         "I felt depressed and insecure when I realized the

3    difference between the reality we were living and what

4    Malinek had promised us.  I had left my family and taken

5    on debt for all of this.  She said that here, everything

6    was going to be great, but it wasn't like that.

7         "I was surprised to see so many people in one house.

8    I was surprised that there wasn't enough space, no

9    privacy, all of us crowded together down there.  I was

10   surprised the way that Ms. Malinek treated people.  She

11   did not treat us like human beings.  In her house, she

12   had all the power and control.  She would yell at people.

13   All her family members were there, and it didn't matter.

14   No one could contradict her.

15        "We arrived in the winter when it was cold and

16   snowing, and living in the basement was difficult.  She

17   did not use heat or if she had it, it did not work.  You

18   could not be in the basement without a coat or a blanket

19   on.  There was no living room, no other space down there,

20   so you could only be in your bed.  There were bunk beds,

21   one on top of another and another on the bottom, and

22   that's how she could fit more people.

23        "It was uncomfortable because there wasn't any place

24   to hang your things, so we had to put everything we had,

25   our clothes and things, on our beds.  I was only allowed

1    in the basement, and there were few times that I went

2    upstairs.  The only way you were allowed upstairs was to

3    pay your debt.  Ms. Malinek would wait in the living room

4    to receive the payment.  If you could not pay, she would

5    get very mad, and you had to pay her interest on your

6    next payment.

7        "I had to go to check-ins with Immigration, and I had

8    an ankle monitor.  Sometimes Ms. Malinek would punish us

9    if she received calls from Immigration.  She would get

10    very mad when Immigration called her to ask about us.

11    When the ankle monitor did not work or it was out of

12    battery, Immigration would first call us, but many times

13    we didn't have cell signal in the basement.  And since

14    Malinek was our reference for Immigration, they would

15    call -- they would then call her.  She would yell at us,

16    asking why we didn't charge our ankle monitors.

17        "I felt very low when I had the ankle bracelet.  She

18    told me one time that Immigration was going to deport me.

19    She would say things like, 'Few people fix their papers.

20    Here, nothing is certain.  One minute you're here but

21    tomorrow, you're gone.'  From the beginning, I felt

22    traumatized because of this, and it has taken a long --

23    this long to feel more normal.

24        "When I go to work now, it's not even comparable to

25    the work and how things were with Malinek.  Now I have

1       freedom in my job.  I work in a job that is good for me.

2       The rules are fair.  I feel good about what I do.  Also,

3       now when I receive my payment, I have control over how to

4       use my earnings.  From my point of view, not all people

5       are like Ms. Malinek.  I wouldn't trust someone like

6       Malinek again, but not everyone is of such poor

7       character.  It is good to trust if you have built that

8       trust with someone.

9           "Until this case is over, I won't be calm.  I'm

10      always thinking about it.  I hope that the law provides a

11      just sentence so that this does not happen to other

12      people in the future because when I came to this country,

13      it was to make a better life, to have a fair work.  But

14      with Malinek, she tricked us, and her promises were never

15      realized.  She just crowded people in her house to make

16      money."

17          Your Honor, the last statement will be Victim 9.

18          THE COURT:  All right.

19          MR. PARENTE:  "I was born in Fray Bartolomé de

20      la Casas, Guatemala.  I have been in a committed

21      relationship with another person who lived in Malinek's

22      house, and we have two children together.  I remember all

23      of the bad moments.  I experienced a great amount of

24      humiliation that I was experienced even more threats.

25          "Malinek also deprived us of our rights as people.

1     There are times in which my family and I remember

2     everything that we experienced with Malinek, all of those

3     devastating moments.  My family and I continue to fight

4     in order to forget so many depressing things and the

5     threats.  I am terrified to give my statement, but I know

6     it is important that the truth be told and be known.

7     "My family and I were affected tremendously by being

8     victims of trafficking because we never thought we would

9     have experienced all that suffering that Ms. Malinek

10    caused us.  Since we were rescued, little by little" --

11    THE COURT:  Do you need a recess?

12    MR. RASCIA:  Can I have a minute, Judge?

13    THE COURT:  All right.

14    (Pause.)

15    MR. RASCIA:  Your Honor, can I ask that we take a

16 break, and perhaps Mr. Parente could just start reading

17 this from the beginning when we reconvene?

18    THE COURT:  All right.  Let's take 15 minutes.  We've

19 been going at it for a while.  15 minutes.

20    MR. RASCIA:  Thank you.

21    (Recess from 3:09 p.m. to 4:04 p.m.)

22    THE CLERK:  19 CR 277, USA versus Concepcion Malinek.

23    THE COURT:  Okay.  This is Judge Chang again.  We're

24 still, I think, connected through remote means.  The same

25 appearances apply except the defendant is no longer present.

1          During the break, she expressed that she was feeling

2     ill and was experiencing some chest pains and distress.  The

3     marshal service took her back up to the lockup to evaluate

4     her.  And she did experience sufficient medical issues that we

5     have decided to adjourn for the day, and we will reschedule.

6     I'll be conferring with the lawyers through the courtroom

7     deputy over the next day and hopefully, we can get this reset

8     pretty quickly.  The information will be put on the docket,

9     but we are adjourned for today.

10          Anything that the government wants to put on the

11    record?

12          MR. PARENTE:  No, your Honor.

13          THE COURT:  All right.  Mr. Rascia, anything?

14          MR. RASCIA:  No, Judge.  Thank you.

15          THE COURT:  All right.  We're adjourned.

16       (Proceedings adjourned at 4:05 p.m.)

17

18

19

20

21

22

23

24

25

1       C E R T I F I C A T E

2           I, Judith A. Walsh, do hereby certify that the

3    foregoing is a complete, true, and accurate transcript of the

4    proceedings had in the above-entitled case before the

5    Honorable EDMOND E. CHANG, one of the judges of said court, at

6    Chicago, Illinois, on March 23, 2021.

7

8    */s/ Judith A. Walsh, CSR, RDR, F/CRR*_____        July 12, 2021

9    Official Court Reporter

10   United States District Court

11   Northern District of Illinois

12   Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25