1          IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )
4            Plaintiff,                )
                                       )
5            v.                        )   No. 19 CR 00277
                                       )
6   CONCEPCION MALINEK,                )   Chicago, Illinois
                                       )   April 19, 2021
7            Defendant.                )   1:05 p.m.

8            TRANSCRIPT OF PROCEEDINGS - Sentencing
                          Volume 2
9            BEFORE THE HONORABLE EDMOND E. CHANG

10  APPEARANCES:

11  For the Plaintiff:          HON. JOHN R. LAUSCH, JR.
                                United States Attorney
12                              BY:  MR. CHRISTOPHER V. PARENTE
                                Assistant United States Attorney
13                              219 South Dearborn Street, Suite 500
                                Chicago, Illinois 60604
14                              (312) 353-5300
                                christopher.v.parente@usdoj.gov
15
    For the Defendant:          MR. ROBERT L. RASCIA
16                              MR. LIAM KELLY
                                650 North Dearborn Street, Suite 700
17                              Chicago, Illinois 60654
                                (312) 994-9100
18                              rrascia@rasciadefense.com

19  ALSO PRESENT:               MR. JORGE CARBAJOSA and
                                MR. ROBERT MENDOZA,
20                              Court Interpreters

21  ALSO PRESENT VIA VIDEOCONFERENCE:
                                MS. LISA RUIZ,
22                              United States Probation Office

23  Court Reporter:             Judith A. Walsh, CSR, RDR, F/CRR
                                Official Court Reporter
24                              219 South Dearborn Street, Room 2118
                                Chicago, Illinois 60604
25                              (312) 702-8865
                                judith_walsh@ilnd.uscourts.gov

1          (Proceedings heard in open court:)

2               THE CLERK:  19 CR 277, USA versus Concepcion Malinek.

3               THE COURT:  All right.  Good afternoon, everyone.  If

4    I could get appearances from the government.

5               MR. PARENTE:  Good afternoon, your Honor.  Chris

6    Parente for the United States.

7               THE COURT:  And defense counsel?

8               MR. RASCIA:  Good afternoon, your Honor.  Robert

9    Rascia and Liam Kelly for Ms. Malinek.

10              THE COURT:  All right.  Good afternoon.

11              And I think we have some interpreters to put on the

12   record.

13              INTERPRETER CARBAJOSA:  Good afternoon, your Honor.

14   Jorge Carbajosa, certified Spanish interpreter, present.

15              INTERPRETER MENDOZA:  Good afternoon, your Honor.

16   Roberto Mendoza, Spanish court interpreter.

17              THE COURT:  Good afternoon to you as well.

18              Okay.  I just want to also make a record that we are

19   on videoconference as well.  I think we're still accommodating

20   some of the victims.

21              Defense counsel, do you have anyone appearing by

22   video?

23              MR. RASCIA:  I do not, your Honor.

24              THE COURT:  All right.  Very good.

25              Okay.  We are ready to resume the sentencing.  I

1    believe --

2            THE CLERK:  Probation is by video.

3            THE COURT:  Oh, I'm sorry.  That's right.  So the

4    probation office is appearing remotely, so if I can get the

5    appearance from the probation office.

6            THE PROBATION OFFICER:  Good afternoon, your Honor.

7    Lisa Ruiz on behalf of the probation office.

8            THE COURT:  Okay.  Good afternoon, Ms. Ruiz.

9            All right.  We were in the midst of the government's

10   3553 presentation.  And in particular I believe, Mr. Parente,

11   when we adjourned last, you had made your way partway through

12   the reading of the statement, victim impact statement of

13   Victim No. 9.

14           I think just for the clarity of the record, why don't

15   you go ahead and start from the beginning of that statement.

16   And then I believe that was the last statement you were going

17   to read.  Is that correct?

18           MR. PARENTE:  That's correct, your Honor.

19           THE COURT:  All right.  So go ahead, Mr. Parente.

20           MR. PARENTE:  Thank you, your Honor.  And your Honor

21   is correct, this is Victim No. 9 who is the spouse of Victim 8

22   that the Court previously heard from at our last hearing.

23           "I was born in Fray Bartolomé de las Casas,

24       Guatemala.  I have been in a committed relationship with

25       another person who lived in Malinek's house, and we have

1    two children together.

2         "I remember all of the bad moments.  I experienced a

3    great amount of humiliation, but I experienced even more

4    threats.  Malinek also deprived us of our rights as

5    people.  There are times in which my family and I

6    remember everything that we experienced with Malinek and

7    all of those devastating moments.  My family and I

8    continue to fight in order to forget so many depressing

9    things and threats.  I am terrified to give my statement,

10   but I know it is important that the truth be told and be

11   known.

12        "My family and I were affected tremendously by being

13   victims of trafficking because we never thought that we

14   would have experienced all of that suffering that

15   Ms. Malinek caused us.  Since we were rescued, little by

16   little we have been trying to forget the horrible

17   treatment by Malinek.

18        "The most difficult and unforgettable moments that do

19   not allow me to live in peace are the insults and yelling

20   by Malinek and the suffering we endured during our time

21   with her, all of which has left us traumatized.  My

22   family and I always wanted to leave her, but Malinek

23   always found a way to intimidate us.  She would threaten

24   us with having us deported if we did not pay the amount

25   of money she demanded.  She would even threaten us

1   calling -- with calling immigration authorities.  It was

2   because of this fear that Malinek instilled in us that we

3   could not ever leave her.

4       "Ms. Malinek forced us to pay whatever amount she

5   demanded, but it was an impossible task to do with the

6   little money we earned.  Malinek charged us so much, and

7   we had to pay her.  It was devastating and difficult for

8   my family and me because we would be left with no money

9   to buy our food at the end of the month.  Even then,

10  Malinek kept increasing our rent amount.  With the

11  increases, there were times where we did not have enough

12  to pay, and she would threaten us with throwing our

13  things in the garbage.  I was devastated when this

14  happened.

15      "Malinek abused us every day especially verbally.

16  She would rush us out of the house to work using

17  derogatory language, and she always threatened us in

18  order to obligate us to pay her and endure so many cruel

19  acts.

20      "Malinek kept us all in her basement where we had no

21  privacy.  When we arrived from work, it was very

22  difficult to shower because there were so many of us.

23  For that same reason, the bathroom was always in use.  It

24  was devastating and traumatizing to be forced to live in

25  those conditions every day because of Malinek.

1           "One of the most devastating moments was when my son

2      had an injury.  My son was injured by boiling water on

3      his head.  My partner and I wanted to take him to a

4      clinic or a hospital, but Malinek told us not to go.  She

5      told us that if we went, we would go to jail or be

6      deported.  She said that our son would be taken from us,

7      and he would stay here with her.  That was how she always

8      intimidated us and kept us with her.  I did not know what

9      to do because it crushed my heart to see my son's wound,

10     but I was more scared to disobey Malinek.  I was scared

11     to lose my son.

12          "Now my family and I continue to be unable to

13     fight -- forget what we suffered through with Malinek.

14     We suffered greatly with her.  Ever since we were

15     rescued, it has been difficult for me to get back to my

16     normal life.  It has been difficult for me to enjoy any

17     activity.  For example, our trips to the park are

18     difficult because we couldn't do that when we lived with

19     Malinek, and the difference makes us think about the

20     malice that Malinek brought to our lives.

21          "We also are fearful to run into anyone that might

22     know her.  We are very isolated and alone because

23     everyone has an opinion about what happened, and we get

24     blamed like what Malinek did to us is our fault.  It

25     makes me so upset.  It is difficult to feel joy without

1        thinking about the suffering that Malinek caused us.

2            "We also carry with us hope that we will no longer

3        suffer because we know that we can count on the support

4        of the authorities, the attorneys, and the agents of the

5        FBI.  Thanks to them, we are no longer with Malinek and

6        at her house where we suffered many things."

7            THE COURT:  All right.  If that's the last statement,

8   then you can move on to your presentation.

9            MR. PARENTE:  Thank you, your Honor.

10           Your Honor, for over ten years, this defendant,

11  Ms. Malinek, used both the hope and the fears of desperate

12  human beings, hopes and fears that this defendant knew all too

13  well, and she weaponized those hopes and fears and used them

14  to exploit women, children, and men for her own personal

15  profit.  Quite simply, your Honor, this defendant trafficked

16  in human beings.

17           The government is requesting your Honor to sentence

18  Ms. Malinek to 97 months' imprisonment for this abhorrent

19  criminal conduct.  The government believes that 97 months is

20  appropriate when this Court considers the 3553(a) factors,

21  most notably the seriousness of the offense, deterrence of

22  others, the history and characteristics of this defendant, and

23  just punishment.

24           Your Honor, I'll start by talking about the

25  seriousness of the offense.  And, your Honor, the victim

1    impact statements that you heard at the last hearing and a

2    little bit this morning -- or this afternoon could go into a

3    labor trafficking textbook at a law school to teach why this

4    crime is so terrible.  It is a crime of exploitation.  It's a

5    crime of dehumanization.  It's a crime where one person

6    recognizes a power imbalance over another human being and

7    exploits that power imbalance for evil, exploitive means.

8           Look at the facts, your Honor, from what happened on

9    the day of the arrest in this case when these victims were

10   freed from that basement.  There were 33 people living inside

11   that single-family home in Cicero.  The victims said there

12   were points where there was up to 45 people inside that

13   residence.

14          22 individuals were in that basement with one

15   bathroom, no heat, mold on the walls, cockroaches in the home,

16   and lice on the children.  And upstairs kept by Ms. Malinek in

17   her bedroom was that ledger, that ledger that she used and

18   held over all these individuals to keep them trapped in that

19   basement.

20          Judge, the defendant used the hopes and the dreams of

21   these victims, their hopes and dreams for a better life in

22   this country as a means to get them from Guatemala to that

23   basement in Cicero.  You heard these statements directly from

24   the victims.  Victim 2 who came here with his 15-year-old

25   daughter told the grand jury, quote:

1       "I fled Guatemala to seek better opportunities for my

2      daughter and to try to find a way out of Guatemala's

3      constant danger.  I was not making enough money in

4      Guatemala to provide for my family, and I wanted to come

5      to the United States to be able to give my family a

6      better life.  Malinek told me that she would find me a

7      much better job in the United States."

8       Similarly, Victim 3 said, "I left Guatemala in search

9 for a better life for my family.  I wanted to give my children

10 a better future."

11       And Victim 8 as well, "I wanted a better future for

12 my child."

13       That was their hopes.  That's what she used with

14 these people.  That's what she dangled in front of them to get

15 them from Guatemala to her basement in Cicero.

16       And, Judge, once she had them there, you've heard and

17 you've read about what this was all about.  She squeezed these

18 people for every last cent.  The details are astounding.  $10

19 she would charge them for cockroach spray so that when they

20 were crammed in that basement, they wouldn't have bugs on

21 them.  $50 for a ride anywhere including if they had to go to

22 the doctor or to meet with immigration officials.  She would

23 charge them interest when their paychecks wouldn't cover the

24 made-up amount that she was charging these people every month.

25       $5 to do a load of wash, $10 if you didn't clean,

1   $100 if you left the lights on in the basement.  She created a

2   vicious debt servitude cycle that none of these people could

3   break free of.

4          Victim 9 told the grand jury quite concisely, your

5   Honor, quote, "Our checks were typically approximately $480 a

6   week, and Malinek would take between 300 -- 350 to $400 for

7   rent and debt payment.  If we ever missed a payment, she would

8   charge us interest of up to $300 a month."

9          By keeping their living expenses so high, your Honor,

10  and the debt, a completely made-up number to begin with, these

11  people were trapped there under her control where she wanted

12  them, and they had no way out of that basement.

13         Your Honor heard through the words of these victims

14  the significant emotional abuse that this woman imposed on

15  these individuals.  Victim 1, Judge, who was a 15-year-old

16  girl, should have been in school, instead is working in a

17  refrigeration -- a factory with refrigeration 40 hours a week

18  to help her dad pay off this made-up debt.

19         And Victim 1 stated that Ms. Malinek threatened

20  adults that if they talked about what was happening in the

21  house or the money they owed her, quote, "she would have them

22  deported back to Guatemala and would keep their kids with

23  her."

24         Imagine the effect on this 15-year-old child as she

25  hears those threats being thrown around in that house, that if

1  anyone said anything, her dad was going to go back to

2  Guatemala and she would be stuck there with this woman.

3       And that's what a trafficker does, Judge.  This woman

4  weaponized a parent's love for their child to control them.

5  "If you say anything about what's going on here, you're going

6  back to your country.  I'm keeping your children here."

7       That's what it means to exploit a power imbalance

8  over another human being.  And she did this constantly.  She

9  told Victim 4 that if she ever tried to report what was going

10  on that she would be deported and, quote, "Because you are

11  poor and I am rich, I will not lose."

12      She would tell the children in the house that she

13  loved them more than their parents.  When Victim 10 finally

14  tried to stand up and push back on these made-up debt numbers,

15  she was told she wasn't smart enough to talk to the people at

16  the bank and have them explain where these interest payments

17  are coming from.

18      She would call them names such as "pigs" and "dirty."

19  Victim 3 said, "When you didn't pay her, she would curse and

20  scream at you.  She had a terrible temper and would insult and

21  humiliate us because we were poor."

22      Victim 3 again told the grand jury, "Ms. Malinek

23  yelled, 'You can't speak here, you fucking Guatemalan.  I

24  speak English and live here, and only I can speak here.'"

25      Victim 4 said, "She told me I was nothing, I was a

1    poor nobody."

2         Victim 9 said, "On days we could not find work, she

3    would get angry and yell at us.  She screamed that we had to

4    work so we could pay off the debt to her.  She was a very mean

5    and frightening woman."

6         Victim 10 who your Honor heard from at our last

7    hearing directly said, "In 2013 I couldn't handle the insults,

8    and I wanted to turn myself into Immigration because her

9    insults and abuse were so bad."

10        And I think what summarizes the emotional abuse,

11   Judge, and what was going on in that house so well was Victim

12   9's statement that:

13        "The living conditions at Malinek's residence were

14       very poor.  There were so many people living there, it

15       made it very uncomfortable.  Malinek was always yelling

16       at us that we had to work so we could pay off the debt.

17       There was no happiness in the home."

18        And, Judge, that theme was just repeated by each one

19   of these individuals who your Honor heard from and were part

20   of this investigation.  It was a miserable place, and it was a

21   miserable place that they could not get out of.

22        They all, all these victims, Judge, talked about the

23   constant threats, the constant threats of taking the children

24   away; that if they went outside without her permission, the

25   police would arrest them; that if anyone talked about what was

1     going on in the house at work or to immigration officials when

2     they had their meetings that they would be deported and the

3     kids would stay with her.

4            Victim 4 said that, "When she would make her threats

5     about us being deported and the kids staying here, she would

6     do it in front of the children, and the children in the house

7     would all start crying."

8            Victim 3 told us at the last hearing, Judge, he

9     described that these threats to take their kids as so harmful

10    because in the simple terms of what Victim 3, the father of

11    these children, said, was "one cannot live without children."

12    And that's what he's thinking as he keeps hearing:  "If I ask

13    for help, if I go to the authorities, she's going to take the

14    one thing that I love:  My children."

15           It was also about control, your Honor.  She had such

16    control over these people.  Victim 1 told us, "When I called

17    my mother, Malinek would send her nephew to listen to what I

18    was saying.  When immigration officials came to the house, we

19    had to meet in the living room, and she told us we could not

20    allow them to go into any other rooms."

21           Victim 3 said, "Before every immigration appointment,

22    she warned us not to tell anybody what was happening in the

23    house or she would send us back to Guatemala."

24           Victim 5 said, Judge, "One time when I missed the

25    debt payment, she called my wife in Guatemala and told her I

1    was mistreating our daughter and not feeding her."  Victim 5

2    also said, "There were times when we would give Malinek our

3    entire paycheck, and we would just sign it over to her."  And

4    we recovered those paychecks, Judge, as part of this

5    investigation.

6            And Victim 7 said, "I didn't know how I would do it,

7    but I'm a man of my word, and I would pay my debt even if I

8    didn't agree with it."  And that's kind of the mind control

9    that she had over these folks, your Honor, is they knew it was

10   made up, but they were so scared and they had such honor that

11   they were going to do what they could to pay this made-up

12   number off.

13           Victim 8 says, "Malinek knew which days were paydays,

14   and she would drive us from work to the currency exchange and

15   take almost the entirety of our check."

16           Victim 9 said, "When I told Malinek I couldn't

17   understand how we owed her so much money, she said she brought

18   us -- she bought diapers and a crib for our child.  I told her

19   that doesn't come close to $12,500 that she said we owed her.

20   She said that she signed her name for us to come to Chicago,

21   and that was worth at least $5,000.  She said she wasn't

22   charging us enough."

23           And, Judge, this offense didn't just involve the

24   exploitation of women and men, adults.  It also involved

25   children.  And your Honor heard a little bit about this, but I

1  think the two children most affected by this were Victim 1 who

2  your Honor heard was a 15-year-old girl who should have been

3  in school.  She should have been a sophomore in high school.

4  And instead, when she got here, Ms. Malinek looked at this

5  girl who saw how young she looks, took her to get fake

6  identity documents and turned this 15-year-old girl into a

7  27-year-old woman.  She stole this girl's childhood, and she

8  sent her off to that factory 40 hours a week where she was

9  making sandwiches so she could give that check to her father

10  to pay this defendant.

11          And you have the two-year-old son of Victims 8 and 9,

12  your Honor, who was burned in this incident that you've heard

13  about.  And again, it completely fits in with the control that

14  this woman had over these people and her fear of anybody

15  finding out about what she was doing in that house so that

16  when this child got burned and needed help, needed treatment,

17  she knew she couldn't let them go for help because she knew

18  the scrutiny it would bring to her, and all that work of

19  threatening these people not to talk about what was going on

20  in that house would be exposed at that hospital or at that

21  clinic.

22          In the words of these two parents, Judge -- and

23  again, if you want an example of the amount of control that

24  this woman had over these people and how bad it is to exploit

25  another human being through a power imbalance such as this,

1    it's imagining the pain and the struggle that two parents have

2    to watch their two-year-old child suffer with a burn to his

3    scalp and refuse that boy medical treatment because of the

4    threats of somebody else.

5           Victim 8, Judge, described what happened.  She said:

6           "I got home, and my son had a terrible burn all over

7        his head.  I needed to take him to the hospital, and

8        Malinek said if I did, she would have me deported.  She

9        said if I took him to the hospital, she would tell the

10       hospital the injury was all my fault.  My son was in

11       extreme pain, and Malinek would only give me tomato sauce

12       and olive oil to put on his head which she said would

13       help.  It took my son weeks to recover from this injury."

14          And the boy's father, Judge, tells a very similar --

15   his experience of what happened.  And he describes that, it

16   was early 2019, and Malinek's parents who typically watched

17   the children were sick and unable to watch our son.  And he

18   asked if he could stay home to watch their son until her

19   parents were better.

20          "And Malinek said my wife and I had to keep working

21   so we could pay off the debt.  Malinek told me her girlfriend

22   was visiting from Guatemala and would watch my son while my

23   wife and I worked."

24          And then he goes on to describe, Judge, what happened

25   to that boy and what he saw when he came back.  He recalled

1  seeing his son in bed with severe burns all over his head.  He

2  said, "My son's hair was soaked in blood and stuck to his

3  head.  My son had burns extending from his forehead to the

4  middle of his head.  My wife and I pleaded with Malinek to let

5  us take our son to the hospital, but she refused."

6          And as you heard in his statement today, Judge, "I

7  didn't know what to do because it crushed my heart to see my

8  son's wound, but I was scared to disobey Malinek.  I was

9  scared to lose my son."

10          And that's what labor trafficking does, Judge.

11  That's what human trafficking does, is it puts people -- it

12  dehumanizes them.  It puts them in a position where they can't

13  even defend their own two-year-old to get him medical

14  treatment and ease his pain.

15          And think about it.  What's on the other side?  Why

16  can't they go to the hospital?  It's all just because she

17  doesn't want this discovered.  She doesn't want her income to

18  be disrupted from these people.  That's an evil person, Judge,

19  who is going to allow that two-year-old to suffer for weeks

20  because of the scrutiny that might happen and the fact that

21  she might not have an income stream anymore from these

22  individuals.  There's no doubt, your Honor, this is a serious

23  offense, and that factor, the seriousness of the offense,

24  fully supports a 97-month sentence.

25          The second factor I'd like to focus on is deterrence.

1    Your Honor, labor trafficking is such a difficult crime to

2    detect.  You saw that she was able to control these people for

3    so long.  This went on for over ten years from the start of

4    when Victim 10 was first encountered.  That's -- these victims

5    will not report this crime.  It is so difficult to detect

6    because of the fear that the traffickers hold over the

7    victims.  So when we do catch someone like Ms. Malinek, it is

8    important that the message be sent to everyone in this

9    community that if you exploit other human beings in this

10   manner, you will be punished, and you will be punished

11   severely.

12           And just punishment, Judge, is a third factor again

13   that completely warrants a 97-month sentence here.  And the

14   punishment matters here.  It matters to the victims, and it

15   matters to the community.  Victim 7, your Honor, says in his

16   victim impact statement:

17           "Until this case is over, I won't be calm.  I'm

18       always thinking about it.  I hope that the law provides a

19       just sentence so that this doesn't happen to other people

20       in the future because when I came to this country, it was

21       to make a better life, to have fair work but with

22       Malinek, she tricked us, and her promises were never

23       realized.  She just crowded people into her house to make

24       money."

25           The victims you heard from, Judge, were scared, but

1  they knew how important it was for your Honor and society to

2  know their story so that just punishment could be given here.

3  Victim 2's statement again, a quote:

4          "Having to live a trafficking experience was hard and

5      something I don't wish for anybody, but I focus on the

6      now.  Trying to talk about this is difficult for me, but

7      I want to make sure that Ms. Malinek does not do this to

8      anyone else, so I will tell you what I can.  She used my

9      daughter and me.  She stole time.  She threatened,

10     traumatized, and humiliated my daughter.  I still feel

11     fear of her power and her threats over my family and me.

12     I am giving this statement because I feel like it is

13     important to tell what happened to me, what happened with

14     her.  I cannot say what I have not lived or seen with my

15     own eyes, but I do have to tell the truth, and this is

16     the truth."

17         Victim 9, Judge:

18         "I remember all the bad moments.  I experienced a

19     great amount of humiliation, but I experienced even more

20     threats.  Malinek deprived us of our rights as people.  I

21     am terrified to give my statement, but I know it is

22     important that the truth be told and be known."

23         Victim 8, Judge:  "It was a very difficult decision

24  for me to give this statement, but I want for justice to be

25  done how it should be."

1      Judge, we owe it to these brave victims who stepped

2  up and came forward and made their statements to your Honor

3  despite the fear that they still fear -- feel both here -- and

4  you heard them mention that their families are in this village

5  in Guatemala.  This is not a one-victim case.  This involves

6  at least the ten victims that are in the indictment as well as

7  the countless children that were also in that house and

8  subject to this defendant's abuse.

9      I want to focus on the history and characteristics,

10 Judge, of this defendant, again, that supports a sentence of

11 97 months as the government is requesting.  This defendant,

12 you read about her background.  She knew exactly the type of

13 struggles that these victims faced, and she knew what was in

14 their heads.  She knew that they just wanted a better life.

15 And that makes her conduct even worse.

16     Instead of trying to ease their burden, their

17 transition to this country, the same difficult transition that

18 she made, she could have been a mentor, a leader for them.

19 Instead, she used all that knowledge against them.  She used

20 it to hurt them, to control them.  She took her history and

21 characteristics and used it against each of those victims when

22 she could have used it to help each of those victims.

23     And I think this defines her character when your

24 Honor is looking at her character.  And Victim 7 told the

25 grand jury, "I told Malinek I could not sleep knowing how much

1   money I owed her, and she said that is the way she likes it

2   and that it gives her confidence that I would pay her the

3   entire debt."

4           And you want to know what someone's character is

5   like?  When you have an individual like that tell you he can't

6   sleep because he's so worried about how much money he owes you

7   and you look at him and say, "That's how I like it," that's

8   who we're dealing with.  She didn't view these people as human

9   beings.  Despite coming from the exact same place they came

10  from, she didn't care, and she used that knowledge against

11  them.

12          Judge, these ten victims all left Guatemala for the

13  hope that this country symbolizes to so many:  Hope for a

14  better life, hope for a chance, as one of the victims said, at

15  fair work for fair pay.  She knew what these people wanted,

16  and she used it against them.  She used it to get them here,

17  and she used it to keep them in her basement.  She knew the

18  love that these parents had for these children, and she

19  weaponized that love.  She exploited that love.  She turned

20  that love into a pair of handcuffs which she used to trap

21  these people inside that Cicero home.

22          Labor trafficking is one of the worst federal crimes

23  that a person can commit.  Victim 9 whose statement you heard

24  today said it best when he said, "Malinek deprived us of our

25  rights as people."

1    For ten years this woman had the power, and she used

2  it to exploit these human beings.  At today's hearing and at

3  the last hearing, these same victims turned the table on her.

4  They've turned the table of power on their own trafficker.

5  These terrified people refuse to be silenced about their

6  trauma and their exploitation, and they help shine a light on

7  Ms. Malinek's dark actions.

8    Judge, Victim 8 said in recounting one of his

9  encounters with Ms. Malinek that she told him, "We know

10  nothing and nobody would care what happened to us because we

11  were poor immigrants."

12    Today, Judge, we ask your Honor to show these victims

13  that people did care about what happened to them, and because

14  they were poor immigrants, Ms. Malinek's words that nobody

15  cared could not be more wrong.  We ask your Honor to let these

16  victims know that just punishment will be done in this case

17  and sentence Ms. Malinek to 97 months' imprisonment for this

18  conduct.  Thank you.

19    THE COURT:  All right.  Thank you, Mr. Parente.

20    All right.  So, Mr. Rascia, how do you want to

21  proceed?  Do you want to argue first, or you're going to

22  present individual witnesses first?

23    MR. RASCIA:  Your Honor, there's been a change in our

24  presentation.  As to one of the witnesses I intended to call,

25  Jeffrey Malinek, Ms. Malinek's husband, he's written a brief

1    statement to the Court, and he will not be testifying.

2              THE COURT:  All right.

3              MR. RASCIA:  I gave a copy to Mr. Parente.

4              And we have one live witness, your Honor, who is

5    going to make a character statement for Ms. Malinek.

6              THE COURT:  Okay.  So let me just confirm.  So,

7    Mr. Parente, you received a copy of this statement from

8    Mr. Malinek?

9              MR. PARENTE:  I did, your Honor, this morning.

10             THE COURT:  All right.  And then and who are you

11   going to present, Mr. Rascia?

12             MR. RASCIA:  Dominga Pan Chok -- Pan Macz.  I'm

13   sorry.

14             THE COURT:  Okay.  And does she need assistance from

15   an interpreter?

16             MR. RASCIA:  She does, your Honor.

17             THE COURT:  All right.  Then let's go off the record

18   for a second.

19        (Discussion off the record.)

20             THE COURT:  Let's go back on the record.

21             Ms. Pan Macz, if you could raise your right hand.

22   Your right hand, please.

23        (Witness sworn.)

24             THE WITNESS (through interpreter):  Yes, I do.

25             THE COURT:  All right.  Please have a seat.

1       All right.  Mr. Rascia, you're going to present both

2   by question and answer, or do you have -- is she just going to

3   give a narrative?

4       MR. RASCIA:  She's just going to give a narrative,

5   your Honor.  I'll just ask her to introduce herself.

6       Can you please tell us your full name?

7       MS. MACZ:  Dominga Pan Macz.

8       MR. RASCIA:  And your full name is spelled

9   D-o-m-i-n-g-a, P-a-n, M-a-c-z, correct?

10      MS. MACZ:  Z.  C as in Charles, Z as in zebra.  In

11  other words, first the C, and then a Z last.

12      MR. RASCIA:  Correct.  You may proceed.

13      INTERPRETER MENDOZA:  May the interpreter instruct

14  the witness, your Honor, to pause after each sentence or

15  paragraph?

16      THE COURT:  Yes, please.

17      MS. MACZ:  Should I look at you, your Honor?

18      THE COURT:  You can look wherever you like.

19      MS. MACZ:  Should I stand up?

20      THE COURT:  No.  You may remain seated.

21      MS. MACZ:  I'd like to talk about what I have seen

22  with respect to my sister, Concepcion.  I arrived here in

23  2018, and she has supported us in every way.  When we get

24  here, she pays for our tickets.  Besides that, she will buy

25  beds for us.  She would buy clothing for us.  And when we have

1   an appointment with immigration or ICE, she would take us

2   there.

3           And if anyone of those who lived in there, she got

4   ill or sick at any point in time, she would take us

5   immediately to the hospital.  For example, a sister-in-law at

6   one point got ill, and she took her to the hospital at 1:00 in

7   the morning.  And when expenses are to be made with regard to

8   medication, she will pay for all medications.

9           And she has taken us to the schools to register our

10  kids whenever we register our children.  Also she has

11  impressed upon us that we should be careful with our children.

12  We should take care of our children and not to let them go out

13  into the streets by themselves.  Also when we first arrived,

14  she bought our tickets.  And also when we lived there, we

15  would be able to go out, go to the park, go to church, go

16  shopping to the stores.  Also she has taken us to the park

17  herself along with our children.

18          And she also told us that whenever ICE visits us,

19  whenever they come to visit because they do come to visit us

20  and we're not there, she has told us not to worry about it

21  because whenever they get there, she would be able to tell

22  them where we are and she would be able to find us.  And also

23  whenever we have an appointment or we have to go to court

24  because we do have to go to immigration sometimes and we do

25  not all speak English, so she comes along with us, and she

1    takes us there to our appointments.

2           She was very supportive of all of us, and that's why

3    we are extremely thankful to her, not only thankful with

4    respect to my own family but also for each and everyone whose

5    family was also being supported by her by letting them stay

6    there.  And thanks to her, we are here, so we thank her for

7    having us come over here.  She also loaned us some money for

8    us to be able to come here, and she was also very helpful when

9    we wanted to come here.

10          And she has also been very supportive to other

11   families, not only to our own families but also to people who

12   cannot afford certain things.  Like, she has been able to send

13   some goods and groceries and food to people that are in the

14   hospital.

15          We're very sorry about everything that transpired.

16   Had she been there for us, maybe my parents wouldn't have died

17   because my parents passed away due to COVID.  And as much as

18   we wanted to be there with them, we weren't able to.  And

19   unfortunately, my parents did die because of COVID.

20          And sometimes when she -- when we wanted to go to

21   church, she would take us to church.  And she would take the

22   children to McDonald's.  She would also tell us that we had to

23   be very responsible with our own children and that we had to

24   make sure they did their homework for school.

25          That's all I would like to say.

1          THE COURT:  All right.  Thank you.

2          Any follow-up questions, Mr. Rascia?

3          MR. RASCIA:  No, your Honor.  Thank you.

4          THE COURT:  All right.  Mr. Parente, anything?

5          MR. PARENTE:  A few questions, Judge.

6          THE COURT:  All right.  You can just ask from the

7  desk there.

8          MS. MACZ:  Yes.

9          MR. PARENTE:  Good afternoon, ma'am.

10          MS. MACZ:  Good afternoon.

11          MR. PARENTE:  Ma'am, am I correct that you're the

12  defendant's sister?

13          MS. MACZ:  Yes.

14          MR. PARENTE:  Would it be fair to say that she

15  treated you differently than maybe some of the other people

16  that we've heard about over the last two hearings?

17          MS. MACZ:  I would not see that as being different in

18  a particular way, but simply when she talked to us, she was

19  merely giving us good advice as to how we should be -- it was

20  as simple as that.

21          MR. PARENTE:  Okay.  So did she treat you the same

22  way as the other people that you heard describe the way that

23  she treated them?

24          MS. MACZ:  Well, since I'm not at home all the time,

25  I wouldn't be able to reply to that.

1    MR. PARENTE:  Okay.  Where were you when you weren't

2 at home?

3    MS. MACZ:  Sometimes I would go shopping, and

4 sometimes I would go to work, things like that.

5    MR. PARENTE:  And where did you work?

6    MS. MACZ:  I was working with my husband doing yard

7 work.

8    MR. PARENTE:  Okay.  So you didn't work at the same

9 factory as the other victims that you heard speak about?

10    MS. MACZ:  Yes, when they first arrived at the

11 beginning.  When I arrived I also went to work with them early

12 on at the beginning for about two months.

13    MR. PARENTE:  And where did you sleep in the house?

14    MS. MACZ:  In the basement.

15    MR. PARENTE:  And did Ms. Malinek ever threaten you

16 with deportation if you didn't pay your debt?

17    MS. MACZ:  No.

18    MR. PARENTE:  Did you ever hear her threaten any

19 others with deportation?

20    MS. MACZ:  At no time did I ever hear that.

21    MR. PARENTE:  At the time -- I'm sorry.  I didn't

22 hear.

23    MS. MACZ:  No, no, I never heard that.

24    MR. PARENTE:  Okay.  And you're aware that she's

25 admitted to that conduct, right?

1      MS. MACZ:  What do you mean by that?

2      MR. PARENTE:  Do you know that Ms. Malinek told this

3  judge that she threatened these individuals with deportation

4  if they didn't pay her the debt?

5      MS. MACZ:  Yes, that's what I heard others say, yes.

6      MR. PARENTE:  But you as her sister, you never had

7  that threat made against you?

8      MS. MACZ:  No, not to me.

9      MR. PARENTE:  Okay.

10      MS. MACZ:  I just heard other people say it.  I just

11  overheard that people were saying it, but they were not

12  addressing me at the time.

13      MR. PARENTE:  And you said that you were in the

14  basement.  Am I correct that you had your own room in the

15  basement?

16      MS. MACZ:  Yes.

17      MR. PARENTE:  And is it fair to say that's again

18  because you were her sister, and you weren't in the bunks with

19  the other 20 or so individuals?

20      MS. MACZ:  No, I wasn't.  I had a room.

21      MR. PARENTE:  You were the only one with a room?

22      MS. MACZ:  No, there were other people who had rooms.

23      MR. PARENTE:  There were --

24      MS. MACZ:  For example --

25      MR. PARENTE:  Go ahead.

1          MS. MACZ:  Others have rooms.  For example, Julio and

2     Hilda, they did have rooms.

3          MR. PARENTE:  In the basement, there's private rooms

4     down there?

5          MS. MACZ:  No -- what do you mean, "private rooms"?

6          MR. PARENTE:  Well, what do you mean by "rooms"?

7          MS. MACZ:  Two rooms, I guess you can call them that.

8     There were two other rooms in the basement.  They were rooms.

9          MR. PARENTE:  And in your opinion, I think you said

10    in your statement that anyone living under your sister's roof

11    was free to come and go as they pleased; is that correct?

12         MS. MACZ:  Yes.

13         MR. PARENTE:  But you know that that's not true,

14    right?

15         MS. MACZ:  Each and every one of them had a key.

16         MR. PARENTE:  But you knew they couldn't move out of

17    that house until the debt was paid, right?

18         MS. MACZ:  Like I said, I'm not at my sister's side

19    at all times.  I don't know what she discussed with each

20    family.

21         MR. PARENTE:  Are you aware that she would have these

22    families sign contracts that said they couldn't leave the

23    house, they couldn't move, change their address until they

24    paid the debt off?

25         MS. MACZ:  Like I said before, everybody or each

1    person that owed her -- owed her, as far as I'm concerned,

2    what I owed to her I was going to pay to her.

3              MR. PARENTE:  Did she have you sign a contract that

4    say that -- that said you wouldn't leave that house until your

5    debt was paid?

6              MS. MACZ:  No.

7              MR. PARENTE:  Judge, may I approach the witness?

8              THE COURT:  For what purpose?

9              MR. PARENTE:  Just to show her a document to see if

10   she recognizes it.

11             THE COURT:  Okay.  What is the nature of the

12   document?

13             MR. PARENTE:  Judge, it's a document that I believe

14   would be her signature with a statement that says she can't

15   leave the house until her debt is paid.

16             THE COURT:  Okay.  So we'll turn the document camera

17   on and so that way, you don't have to approach her.

18             Okay.  You can give it an exhibit number too.

19             MR. PARENTE:  It's Government Exhibit 1, your Honor.

20             Ma'am, would you take a look at this exhibit?

21             MS. MACZ:  Yes.

22             MR. PARENTE:  Do you recognize this exhibit?

23             MS. MACZ:  Well, the truth is I don't remember when I

24   signed it, but I do remember signing a sheet of paper.

25             MR. PARENTE:  Okay.  And what does this line here

1     read that starts, "no podrá cambier"?

2          MS. MACZ:  Yes, but when she handed that to me, I was

3     about to leave.  And I told her, "I'm about to leave," so I

4     think that's what happened.

5          MR. PARENTE:  Okay.  I was just asking, what does

6     that sentence say to you?

7          MS. MACZ:  What I understand is that I am not going

8     to be able to leave the place until I paid that amount of

9     money that's written down there on that paper.

10          MR. PARENTE:  Okay.  So maybe the statement that

11     people are allowed to just leave whenever they want once your

12     debt is paid, do we agree that that's kind of the situation

13     that was happening?

14          MS. MACZ:  Uh-huh.  That's what it states in here.

15          MR. PARENTE:  And this is what she gave you, right?

16          MS. MACZ:  Yes, uh-huh, but I just don't recall the

17     exact time I signed it.

18          MR. PARENTE:  Right.  But you recall her handing it

19     to you?

20          MS. MACZ:  But I don't have a copy of this.

21          MR. PARENTE:  Okay.  So is it fair to say, while we

22     do go to church and we go to McDonald's, it's not exactly, you

23     can just move out whenever you want.  She had you -- she

24     presented you with a contract that said you cannot leave until

25     the debt is paid?

1          MS. MACZ:  Uh-huh.

2          MR. PARENTE:  Thank you, your Honor.

3          MS. MACZ:  Okay.

4          THE COURT:  All right.  Can you retrieve the exhibit?

5          Mr. Rascia, any follow-up questions?

6          MR. RASCIA:  No, your Honor.

7          THE COURT:  Okay.  You are excused.  I'm going to ask

8    you to take the microphone cover.

9          All right.  And do you have any other witnesses,

10   Mr. Rascia?

11         MR. RASCIA:  No live witnesses, your Honor.

12         THE COURT:  All right.  Then you're excused.

13        (Witness excused.)

14         THE COURT:  Okay.  We've done the interpreter

15   hand-off, so go ahead, Mr. Rascia.

16         MR. RASCIA:  Your Honor, to start with, just to make

17   sure that I'm on the same page with the Court, based on your

18   prior ruling, I think the advisory sentencing guideline range

19   in this case is 63 to 78 months, correct?

20         THE COURT:  That's correct.

21         MR. RASCIA:  And Mr. Parente is seeking a sentence

22   well above the high end of that range.

23         Judge, you've heard plenty about the nature and

24   circumstances of the offense.  And to avoid any confusion,

25   certainly Ms. Malinek has acknowledged in her written plea

1    declaration what she did.  The purpose of hearing from

2    Ms. Pan Macz was not to assert that the other individuals gave

3    a false narrative to the Court but to establish that people

4    had different experiences living in that home.  This was not a

5    doom and gloom situation day in/day out.

6           And, Judge, there's I think something that kind of

7    crystallizes that.  Victim No. 3, as you may recall, testified

8    that he had been living in that house for approximately eight

9    months before he arranged to have his wife and children come

10   and live at that residence.  That was a decision that Victim

11   No. 3 made.  I would assume that Victim No. 3 loves his wife

12   and children and would not be desirous of putting them into an

13   environment where they risked injury or sickness.

14          Certainly, the defendant acknowledges and has not

15   protested the information that's in her presentence

16   investigation report.  There were way too many people living

17   in that house.  Based on the number of people living in that

18   house, the conditions, even however hard anyone tried to keep

19   things in check, certainly would not have been an optimum

20   place to stay.  Certainly, this was not a place that was Four

21   Season-esque, nor was it likely even up to standards with

22   Motel 6, but these are people that made the decision to come

23   there, and they did so for their own individual reasons.

24          Ms. Malinek, based on her life's work, had always

25   helped people.  And she started on this journey with the

1    desire to help people.  She made very substantial expenditures

2    on her own to assist these people.  And those standard

3    expenditures included transportation costs for airline

4    tickets; bus tickets; food; clothing, all types of clothing,

5    from outerwear to underwear, to shoes and socks; paid in

6    advance fees for these individuals to meet with an immigration

7    lawyer; paid in advance fees for medical examinations that

8    were necessary, drove them to appointments.

9           Certainly, Ms. Malinek's conduct in aggressively

10   pursuing the repayment of those fees and her acknowledgement

11   that the fees were beyond what she had paid out of her own

12   pocket to accommodate these people, that's why she's pled

13   guilty to this crime, and that's why she's before you today.

14          In her plea declaration, to be crystal clear,

15   Ms. Malinek admitted that she allowed Victim 10 to reside at

16   her residence and continued to demand payment of a debt that

17   Malinek claimed Victim 10 owed her for services provided.

18   While Victim 10 resided at Malinek's residence, she was

19   employed, and the defendant demanded and received from Victim

20   10 a substantial portion of Victim 10's earnings to apply

21   towards the debt owed by Victim 10 to the defendant.

22          The defendant demanded payment of the debt from

23   Victim 10, and when Victim 10 did not make a prompt payment of

24   the debt defendant claimed was owed to her, the defendant

25   threatened to contact immigration authorities to seek Victim

1    10's deportation back to Guatemala.

2            In her plea declaration, Ms. Malinek also

3    acknowledged that she agreed and provided assistance for a fee

4    to other individuals to enter the United States from 2009

5    through 2019.  She acknowledged all the victims as charged in

6    the superseding indictment in Counts 1 through 9.  The

7    defendant acknowledged that she claimed these individuals owed

8    a debt to her for providing services and housing to them in an

9    amount that she individually determined.  Defendant demanded

10   prompt payment of the debt and also threatened these people

11   with deportation as a means to collect the payment.  She

12   acknowledged that she committed that conduct.

13           That's the essence of the crime that she's been

14   charged with, and she's acknowledged that that's what she did.

15   And I don't want the Court to think that Ms. Pan Macz's

16   testimony was an attempt to say that those things didn't

17   happen.  They didn't happen with her.  Different people had

18   different experiences but again, many of these victims had

19   some sort of family relationship to Ms. Malinek, and she

20   provided to them a very important opportunity which was to be

21   released from the detention center in Texas, acknowledging

22   that she would provide their transportation and would agree to

23   house them in her residence.

24           Where Ms. Malinek made a left turn and created a huge

25   problem for herself and the others is that she continuously

1    said yes to people that she should not have said yes to.  The

2    residence where she lived was not a place that could have

3    accommodated that number of people.  She's acknowledged that

4    that was a misstep on her part, and she's acknowledged that

5    her conduct in treating people the way she did was

6    inappropriate.

7           Most importantly, Ms. Malinek pled guilty to Count 10

8    of the superseding indictment in this case, and it was the

9    count that carried the highest offense level because of the

10   length of time involved.  So she's made no attempt to try to

11   avoid the consequences of her conduct.  And she also

12   acknowledged the underlying conduct that resulted in the

13   two-level increase, which was her involvement in the securing

14   of the false identification documents which various

15   individuals had used in order to obtain employment.

16          So, Judge, Ms. Malinek has completely acknowledged

17   her conduct.  She started on this journey in a different way

18   than where it ended up but nonetheless, she knows she's going

19   to suffer the consequences today.

20          Ms. Malinek did not have the best of lives from its

21   inception.  She's now 51 years old as she sits before you

22   today.  She's in poor physical health.  She suffers from

23   diabetes, and she's currently taking medication to help with

24   the anxiety and depression that her incarceration and

25   involvement in this crime have brought to her.

1       From what I think I hear from the victims in this

2  case is it's somewhat of an eye for an eye mentality which

3  they're justified in perhaps seeking.  They were harmed, and

4  they feel that Ms. Malinek should suffer the consequences of

5  causing that harm to her.  Well, Ms. Malinek has already

6  suffered some very substantial harm.  She's been in jail for

7  25 months at this point, starting out at the MCC and now

8  currently being held in the Livingston County Jail.  She's

9  been in jail throughout the pandemic which has caused very

10 substantial hardship on her as it does on any inmate because

11 she's no longer afforded the opportunity for an in-person

12 visit, not even an in-person visit with her lawyer.

13      So along the way, Ms. Malinek has had to suffer with

14 the anguishing grief of her conduct that caused her to be in

15 jail and beyond that, her belief that had she not engaged in

16 this conduct and had not been charged with this crime, she

17 would have been available to her mother and father to assist

18 them during the time that they were living in her home to a

19 level where perhaps they wouldn't have become ill and they

20 wouldn't have passed away.  That's a tremendous burden that's

21 weighed on her throughout the time since that event happened

22 approximately a year ago.

23      Judge, when we were here last, as you observed,

24 Ms. Malinek became very emotional while she was in court,

25 overwhelmed, and explained to me that to hear how much she had

1     harmed these other victims caused her great grief.  That was

2     not her intention, but her methods certainly that she employed

3     were not appropriate methods.

4          In regards to Ms. Malinek's life, things started out

5     for her very difficult with a lot of difficulty.  Her mother

6     became pregnant with a gentleman that she was not married to,

7     something that was very scorned upon in the community she

8     lived in in Guatemala.  It was suggested by the defendant's

9     grandmother that the mom abort the pregnancy.  She chose not

10    to do that and gave birth to the defendant, essentially in a

11    field with no help or support from the father.  For many

12    years, he was not part of the defendant's life.

13         The defendant lived in extreme poverty.  At a young

14    age, she worked in the field as a farm worker, did not have

15    any substantial clothing or food and lived a very poor and

16    difficult existence.  Later on when the defendant was about 19

17    years old, she joined a convent as a way to -- I'm sorry,

18    Judge.  13 years old.

19         She joined a convent to learn and get educated and

20    began her training to learn to help others as part of her

21    mission.  She later came to the United States on a religious

22    visa, remained in the convent, and later became disenchanted

23    with the convent and left and went off on her own, but she

24    continued in her work in helping others.  She was a caretaker

25    for an individual and provided live-in day-to-day care.

1       During that time, she met with what later became her

2   husband who was an ambulance driver who used to come to the

3   residence in order to transport the person that the defendant

4   was working for to medical appointments by ambulance, and they

5   struck up a relationship and later married.

6       Over time, the defendant always worked, sought to

7   better herself.  And things changed dramatically in 2015.  And

8   I'll tender to the Court Defendant's Exhibits 1-A, 1-B, and

9   1-C.  These are photographs of the injuries that Ms. Malinek

10  suffered in a very horrific bus accident.  The individual that

11  was seated next to her on the bus died in this accident.

12  Because of the severe injuries Ms. Malinek had suffered at

13  that time, it took her quite a bit of time to recover, and she

14  was disabled from that point forward, unable to maintain any

15  full-time employment because of her physical condition.

16      Over the years of Ms. Malinek's life starting with

17  her time in Guatemala and joining the convent and being a

18  caretaker, she developed a desire to help other people, and

19  that's what drew her into this situation.  And she's

20  acknowledged in her plea declaration and in her conduct and

21  attitude towards the case that she knows the methods she

22  employed in attempting to help these people were clearly

23  wrong, and that's why she's guilty of the crime as she sits

24  before you today.

25      Judge, in regards to the conditions in the residence,

1    as I indicated earlier, certainly with that number of people

2    in the home, even though she had contracted with an

3    exterminator, even though she had paid to have the catch basin

4    cleaned and contacted the Town of Cicero to repair the sewer

5    and they set up a regular regimen to clean the residence,

6    those efforts certainly, although they may have helped to some

7    degree, was a situation that with that number of people was

8    bound to be out of control.

9           And again, Ms. Malinek accepts responsibility for

10   having created that situation because it was at her invitation

11   that these people were allowed to leave the immigration

12   detention center in Texas and come to live in her residence in

13   Cicero.

14          Judge, punishment is a very difficult thing to assess

15   in a case.  97 months in prison to me conjures up the type of

16   case where someone died and someone has suffered a lifelong

17   debilitating injury, someone who has suffered much more

18   extreme consequences than the victims have in this case.  And

19   I'm not belittling their feelings about what happened to them.

20   They're certainly entitled to that.

21          But as you're aware from the information in this

22   case, these individuals, other than Victim 10, were not people

23   that had a long-term stay in Ms. Malinek's residence.  And in

24   addition to that, Ms. Malinek stands ready to pay a very

25   substantial amount of restitution as requested by the

1  government.  Again, the payment of the restitution isn't an

2  attempt to buy herself a shorter sentence, but it's a

3  recognition that her conduct was such that it needed to be

4  punished and a recognition that she will continue to suffer

5  the consequences of her conduct beyond whatever punishment the

6  Court imposes in this case.

7          The financial hardship of being able to deplete a

8  retirement account and list your home for sale to pay these

9  victims is certainly something that's going to take many, many

10  years for the defendant and her husband to recover from, and

11  perhaps they'll never recover from it.

12          But in regards to the punishment that may be

13  necessary to deter Ms. Malinek or perhaps someone else from

14  engaging in this type of activity, I would focus, I choose to

15  focus on the fact that this is a person that does not have a

16  history of criminal conduct other than what's related in this

17  case.  She's had no prior experiences with law enforcement.

18  She's had no prior experience with a term of incarceration,

19  certainly a situation that has strong long-term effects on any

20  person.

21          Adding to that, being incarcerated during a pandemic

22  period, being incarcerated and having to sit basically on your

23  hands while your mother and father are buried will leave

24  long-term effects on Ms. Malinek that I'm sure she'll never

25  forget and understanding that it was her own conduct that

1    caused her to be in that situation.

2           Judge, the class offense here is a Class C felony

3    which by statute would allow the Court to impose a sentence of

4    probation legally.  And I'm not asking you to impose a

5    sentence of probation but certainly, the time that Ms. Malinek

6    has already been in jail and the additional time that the

7    Court will likely impose I think is such that it's, I think,

8    very crystal clear that Ms. Malinek is not going to run afoul

9    of the law again.  And this is also a case that allows the

10   Court to impose up to three years of supervised release.

11          So whatever term of incarceration the Court deems

12   appropriate for Ms. Malinek to serve, that's not going to be

13   the end of the ordeal for her.  She's going to have to make

14   sure that every dime of the restitution is paid.  She's going

15   to have to make sure that she complies with all the conditions

16   of her release including not engaging in any criminal

17   activity.

18          Certainly I think it's worth the Court's

19   consideration beyond the low end of the guideline range.  This

20   is a 51-year-old woman.  She suffers from diabetes, is

21   currently taking medication for anxiety and depression, has a

22   disability because of an accident, has admitted her conduct to

23   the Court, has not challenged the representations made in the

24   presentence investigation report.

25          Perhaps Ms. Malinek at the time did not understand

1   that the words she used would have the effect that they did,

2   but she certainly learned that while she was sitting in court

3   back on March the 23rd and listened to it and reacted the way

4   she did.  And, Judge, I think her reaction was sincere.  It

5   expressed an overwhelming sense of grief and embarrassment for

6   having done the things that the government has told you she

7   did, and she's acknowledged that she did them.  So, Judge, I

8   think that the sentence the Court should impose hopefully will

9   factor those things into the sentence that you ultimately do

10  impose.

11          Judge, in regards to the term of incarceration that

12  the Court may impose in this case, I'm asking the Court to

13  consider, based on the defendant's lack of prior criminality,

14  her extreme remorse, her acknowledgement of the events and

15  things that she did in this case, her plea of guilty, her life

16  situation, to consider a sentence of 36 months.

17          The defendant, while doing and saying the things she

18  did, for whatever little value this has, she certainly didn't

19  follow through on the boasts that she made.  And maybe she

20  realized that she shouldn't have said those things in the

21  first place, but those are the things that she said that

22  caused her to be guilty in this case:  Demanding the money,

23  making the threats that she made.  She also paid out a lot of

24  money for all of the items that we've discussed.  So, Judge,

25  I'm asking for all those reasons that you consider a sentence

1    of 36 months.

2         THE COURT:  All right.  Thank you, Mr. Rascia.

3         Before we hear from the defendant, let's take care of

4    a couple other things first.  On restitution, I want to make

5    sure that the amounts agreed on in the victim spreadsheet that

6    we received from the government back on March 23rd actually,

7    so are those agreed-upon amounts, Mr. Rascia?

8         MR. RASCIA:  Judge, I believe the amount -- and I

9    don't have the document in front of me at the moment, but I

10   believe the amount is 112,000.

11        THE COURT:  You know, I don't actually have the total

12   on the spreadsheet.

13        MR. RASCIA:  Judge, I have on the document previously

14   provided to me from Mr. Parente, the total estimated

15   restitution for all ten victims is $112,545.

16        THE COURT:  Does that square with your calculation,

17   Mr. Parente?

18        MR. PARENTE:  Yes, Judge.  That's the number.

19        MR. RASCIA:  Judge, may I make a comment about that

20   as well?

21        THE COURT:  All right.

22        MR. RASCIA:  Judge, again, as you -- when you look at

23   this chart that's been provided by the government, for

24   example, there's amounts in here for counseling and other

25   items that to my knowledge, I don't know if anyone has gone

1  for counseling.  But the point is, again, Ms. Malinek has made

2  no challenge to that.  Whatever needs to be done for these

3  victims, she's willing to do, and she's willing to pay for

4  which I think is a further indication of her remorse over

5  having acted the way she did in relation to these individuals.

6  Even though she herself paid out substantial sums of money,

7  she is agreeing to pay this money.

8         THE COURT:  All right.  Thank you, Mr. Rascia.

9         And just, the individual breakdowns on that

10  spreadsheet, you also agree to?

11         MR. RASCIA:  That's correct, Judge.

12         THE COURT:  All right.  And then with regard to

13  forfeiture, what's happening on that count?

14         MR. PARENTE:  Judge, we are going to ask, and I've

15  spoken to defense counsel about this, that the preliminary

16  order of forfeiture be entered today.  What I think is going

17  to happen, and it's my understanding is, the house is jointly

18  owned, the house which was used to commit the crime which is,

19  we fully intended to forfeit.  And I don't believe there's an

20  objection to that.  The defendant's spouse lives there and is

21  allegedly at least a part owner of the house.

22         So as part of a compromise between the government and

23  the defense, my understanding is the house will either be sold

24  or a second mortgage will be taken out, and that money will be

25  used to pay the remainder of the restitution at which point

1    the government will not seek to forfeit the home.

2         MR. RASCIA:  And, Judge, so you're aware, there is a

3    substantial portion of the restitution, approximately $80,000,

4    which is currently available from the withdrawal of those

5    funds from a retirement account.  The balance is being worked

6    on through either the sale or securing a loan against the

7    property, but there's been a lot of difficulty with that, but

8    it will be paid.

9         THE COURT:  Okay.  So on -- are you asking me to hold

10   off on the preliminary order of forfeiture?

11        MR. PARENTE:  No.  I'm asking you to enter it.  And

12   my understanding is, it has to be entered today.  And I

13   believe defense is in agreement with this.  And we will not --

14   we'll dismiss it if the payment is made.

15        THE COURT:  I see.  Okay.  All right.  Any objection

16   to that plan, Mr. Rascia?

17        MR. RASCIA:  No, your Honor.  I have discussed that

18   with Mr. Parente several times, and we're in agreement.

19        THE COURT:  Okay.

20        MR. RASCIA:  And I discussed it with Ms. Malinek.

21        THE COURT:  Okay.  All right.  So then we'll enter

22   the preliminary order of forfeiture.  And then I'll wait for

23   presumably dismissal of it or if things go sideways, then you

24   know we'll hear proceedings on a final order of forfeiture.

25        Okay.  And let's talk about the supervised release

1   conditions before the allocution, so if you can turn to Page

2   18 of the presentence report.

3           All right.  Any objection, Mr. Rascia, to mandatory

4   conditions 1, 2, and 5?

5           MR. RASCIA:  No, Judge.

6           THE COURT:  All right.  Those will be entered because

7   they are mandatory.

8           No. 6 was not proposed.  And I believe that's because

9   the PSR explained there is no indication of any problem on

10  this count whatsoever.  So, Mr. Parente, is there any

11  objection to not imposing 6?

12          MR. PARENTE:  No, your Honor.

13          THE COURT:  Okay.  It will not be imposed.

14          With regard to discretionary conditions, any

15  objection, Mr. Rascia, to No. 4?

16          MR. RASCIA:  Judge, the only issue is because of

17  Ms. Malinek's disability, I don't know if there's employment

18  that will be available to her.  But she certainly is willing

19  to seek any type of employment that would fit within what her

20  physical ability is.

21          THE COURT:  All right.  Let's add, after the words

22  "lawful employment," "if able to do so."

23          All right.  With that modification, any objection,

24  Mr. Rascia?

25          MR. RASCIA:  No, your Honor.

1        THE COURT:  And any objection, Mr. Parente?

2        MR. PARENTE:  No, your Honor.

3        THE COURT:  All right.  On No. 6 on the bottom of

4   Page 18, I propose to add the word "felony" in front of

5   "criminal activity" just given the breadth of federal, state,

6   and local law these days including misdemeanor.

7        So any objection to adding that, Mr. Parente?

8        MR. PARENTE:  No, your Honor.

9        THE COURT:  And with that addition, any objection,

10  Mr. Rascia?

11       MR. RASCIA:  No, your Honor.

12       THE COURT:  All right.  Page 19, the provision on

13  No. 7 is excessive use and then, of course, the back half of

14  that on any controlled substances.  Any objection to that,

15  Mr. Rascia?

16       MR. RASCIA:  No, your Honor.

17       THE COURT:  All right.  So No. 7 will be imposed as

18  authored.

19       The excessive use prohibition is warranted just in

20  light of the fact that excessive use does impair judgment and

21  can lead to additional recidivism.  So I think that's

22  important.

23       Any objection to No. 8, Mr. Rascia?

24       MR. RASCIA:  No, your Honor.

25       THE COURT:  All right.  That will be imposed in light

1    of the felony nature of the offense.

2            I think in No. 9, it would make sense to require the

3    mental health treatment program if the probation office so

4    directs.  So is there any objection to imposing that,

5    Mr. Rascia?

6            MR. RASCIA:  No, your Honor.

7            THE COURT:  All right.  Mr. Parente?

8            MR. PARENTE:  No, your Honor.

9            THE COURT:  Okay.  So we will check the box for No. 9

10   and then the mental health treatment subparagraph.

11           All right.  The monitoring conditions, any objection,

12   Mr. Rascia, to Nos. 14, 15, skip 16 for the moment, 17, and

13   18?

14           MR. RASCIA:  No objection to those, your Honor.

15           THE COURT:  All right.  Those will be imposed as

16   authored.  Those assist the probation officer in monitoring

17   compliance with all the other conditions of release.

18           No. 16, what I typically do here is uncheck the boxes

19   for "work, school, community service location" and I instead

20   include an objection period of seven days after notification

21   of the proposed location.  In other words, if the probation

22   officer proposes work or school or anyplace else, the

23   defendant can pose an objection.

24           So is there any objection to that edit, Mr. Parente?

25           MR. PARENTE:  No, your Honor.

1          THE COURT:  And Mr. Rascia?

2          MR. RASCIA:  No, your Honor.

3          THE COURT:  Okay.  Turning to Page 21, the special

4    conditions, I typically don't have a default of community

5    service after 60 days.  I would just rather the probation

6    office come back at some reasonable time.

7          So any objection, Mr. Parente, to not imposing 3?

8          MR. PARENTE:  No, your Honor.

9          THE COURT:  All right.  In light of the financial

10   obligations, hopefully those will be paid off relatively soon.

11         Any objection to 5, 6, 7, and 8, Mr. Rascia?

12         MR. RASCIA:  No, your Honor.

13         THE COURT:  All right.  Those will be imposed as

14   authored.

15         And then turning to Page 2 -- no, still on 22, any

16   objection to No. 10, Mr. Rascia?

17         MR. RASCIA:  No, Judge.

18         THE COURT:  All right.  So that will be imposed as

19   authored.  And then --

20         MR. RASCIA:  Judge?

21         THE COURT:  Yes.

22         MR. RASCIA:  I suppose it was an error on my part not

23   to address this, but in light of the substantial restitution,

24   as part of my request to the Court sentencing-wise, I'm asking

25   that you not impose a fine.

1      THE COURT:  Okay.  I'll take that under

2  consideration.  Thank you.

3      Okay.  Page 23, the discretionary -- I'm sorry, the

4  special condition 11, any objection to that, Mr. Rascia?

5      MR. RASCIA:  No, your Honor.

6      THE COURT:  All right.  That will be imposed as

7  authored.  It is for the safety of the probation office.

8      All right.  Now, No. 14, I understand why it was

9  proposed in light of the information in Paragraph 77 of the

10 PSR.  However, that allegation was not proven up.  I don't

11 believe it resulted in any discipline either from the BOP or

12 from the marshal service.  So I don't really think there is a

13 basis for this.

14     What's the government's position?

15     MR. PARENTE:  I agree, Judge.  I don't -- I think

16 it's close and I think there's other stuff.  I can tell your

17 Honor, we looked into some of this, and we're not in a

18 position to prove it up to your Honor.

19     THE COURT:  Okay.  I'm not going to impose No. 14.

20 And given that there's another mental health treatment

21 condition that's more broad, if there are some issues that are

22 uncovered, then they can be addressed at that time, but there

23 is not a factual basis for 14.

24     Okay.  Anything else on the proposed conditions?

25 Obviously, I will deliberate over the length of it after

1    hearing the defendant's allocution.  Anything else for the
2    government?
3              MR. PARENTE:  No, your Honor.
4              THE COURT:  Mr. Rascia?
5              MR. RASCIA:  No, your Honor.
6              THE COURT:  Okay.  Mr. Rascia, do you want to check
7    if Ms. Malinek wants a break before the allocution?  We've
8    been going for about an hour and 40 minutes.
9              MR. RASCIA:  Please, Judge.  Thank you.
10             THE COURT:  Okay.  All right.  Let's take 15 minutes.
11        (Recess from 2:39 p.m. to 2:56 p.m.)
12             THE COURT:  All right.  We're back on the record.
13             I'll just make sure the interpreters get situated.
14             INTERPRETER MENDOZA:  Yes, your Honor.
15             THE COURT:  All right.  We'll hear now from
16   Ms. Malinek.
17             Ms. Malinek, you have a right to say whatever you
18   would like on your behalf.  So if you have something to say,
19   please go ahead and do so.
20             THE DEFENDANT (through the interpreter):  Your Honor,
21   Judge Chang, I am here now --
22             THE COURT:  Actually, let's -- I'm sorry.
23   Mr. Mendoza, let's -- I can turn your microphone on at that
24   table and that way you don't have to be quite so close.  So
25   why don't I do that.

1      INTERPRETER MENDOZA:  Thank you, your Honor.  From

2  here?

3      THE COURT:  Yes.  So the mikes on that table should

4  be on now.

5      INTERPRETER MENDOZA:  Testing.

6      THE COURT:  Okay.  There we go.

7      Ms. Malinek, please go ahead.

8      THE DEFENDANT:  Your Honor, I'm here in front of you

9  today, and I'm asking you in the name of Jesus, Jesus who has

10  brought me here today, in the name of the Lord, my God who is

11  in heaven and earth, I'm asking your Honor, telling you that I

12  am very sorry, and I hope for your forgiveness because I have

13  two judges:  One judge in this world and another one after we

14  depart this life.

15      And I am asking for your forgiveness, and I am

16  apologizing to everyone from the bottom of my heart.  To my

17  aunts and uncles, to my cousins, my nieces and nephews all

18  belonging to the same family, and the two siblings --

19      THE DEFENDANT (in English):  Two brothers.

20      THE DEFENDANT (through the interpreter):  Two

21  brothers, the two brothers and the 15-year-old who were

22  friends of my family because I have offended them.  If I ever

23  hurt them with my words or with my actions, I did not mean to

24  do it.  I am apologizing from the bottom of my heart to all of

25  them.

1    And if I have violated any laws of this world, of the

2  laws of this world, especially having violated the laws of the

3  United States, I cannot take back what I did.  I cannot go

4  back to the past.  So I would like to ask forgiveness of my

5  husband and of my family who are here in support of him and

6  also of my dear mother and Mr. Alberto, the one who gave me

7  life.  I am sure, Mom, that you're here with me listening to

8  what I'm saying.  I remember when you were there behind me two

9  years ago every time I came back.

10    Your Honor, in the name of the Lord in heaven, I

11  would like you to forgive me.  I am a woman, and I am a human

12  being.  Please have mercy on me, your Honor.  May the Lord

13  also hear you.  I am very repentant because we were -- when we

14  were out in the street with my husband, we are destitute now.

15  Me and my husband are destitute.

16    I also would like to talk a little bit about my

17  personal life when I was a little child.  Thank you, Mom, for

18  doing everything within your power to do the best for me when

19  you were pregnant just like my attorney said before.  My mom

20  was forced to drink medication so that she would abort me

21  three times.

22    My mother, she's a very humane woman, a woman, a

23  woman who is also a friend.  In fact, I used to call her "my

24  perfect mother."  Whatever she gave me when I was little along

25  with my brother Marcelino when he was little as well, all we

1    had for food was tortillas and salt and chili pepper,

2    sometimes beans and sometimes fish from the river.  I didn't

3    have clothing.

4          When I was six years old or five, we were by the

5    river with my mom.  And I looked -- took a look at her back,

6    and she had a lot of markings, marks.  And I asked, "Mom, what

7    are those marks for?"

8          And she said, "They're because I refused to take the

9    medication."

10          Like I said before, I didn't have any clothing.  I

11    didn't have a bed.  I didn't have a place to stay.  We were

12    homeless.  We lived up on the mountains; no TV, no radio, no

13    school but love from my mother.  Did we ever have love from my

14    mother, me and my brother.

15          When my mother married Don Alberto, both children,

16    both of us were present.  That is a reason why at the age of

17    13 I joined a convent because I didn't have a bloomer.  I

18    didn't have a bra.  I didn't have any shoes.  I had no

19    schooling.  And I started, and I was taught the Bible, Jesus,

20    about Jesus.  And we all get a call from Jesus.  And we all

21    get a specific mission from Jesus, how to serve God and his

22    people as well.

23          And I was in the convent for about 19 years with the

24    San Franciscan school sisters.  And I did my mission serving

25    the Guatemalan community serving different groups, attending

1   to the needs of the people, to the family.  And then I came to

2   the United States as a nun.  And then I worked in Wisconsin

3   helping to feed the elderly.  The great mistake I made, the

4   great mistake that I had made was accepting, acquiescing to

5   people that asked me for a favor.

6           I could lie to you all in here and tell you things,

7   but there's a god, a god that is so great, and I do fear that

8   god.  I could just justify myself here, but I feel humbled.  I

9   feel humbled.  I feel ashamed.  I have asked the Lord -- in

10  2015, I had a major accident, and I have asked him, "How come

11  you didn't take me?"  How come he choose to take that who was

12  seated next to me?  So then when the people started coming

13  over, when the families started to come, that is why you can

14  have a band on your family.

15          It was not easy either with the difficulties I was

16  having in terms of my ability to walk and my health and my

17  disease.  24 hours a day, seven days a week, I get a call from

18  Immigration and also from ICE when other people were there.  I

19  bought food, and I bought clothing, and I took people to the

20  hospital.  Sometimes I was sick myself.  I tried to do the

21  best I could as a woman and as a human being, and amongst all

22  of that, I committed my mistake.

23          Your Honor, please have mercy on me, your Honor.

24  Perhaps I don't deserve it because hurting a person is as if I

25  were doing this to God.  That's why he is my only witness.

1   And he also allowed for me to continue to live after my

2   accident.  It's impossible to understand.  Two people seated

3   on the same chair:  One lives and one dies.  That is because

4   there is a purpose for each and every person.

5        During the last 25 months which I have spent in jail,

6   it hasn't been easy.  When I was at the MCC, we were eating

7   food with cockroaches.  There was a lot of mold in my room.

8   It was very difficult for me to be able to breathe and also

9   because of my condition.  Not only that, the bread that they

10   were feeding us was also moldy.  It happened to me twice.  I

11   got sick twice.  Once, I was really sick at night throwing up.

12   And the other time, I remember it was a turkey sandwich.  And

13   in 2019, we were eating food from 2018.

14        And he would tell us, he would tell us, that

15   officer -- I don't know what his name is.  I could say this in

16   English because I don't know how to say this in Spanish.

17        THE DEFENDANT (in English):  "I don't give a shit

18   about you."  He said it like this.  "I don't give a shit about

19   my kids at home.  Why should I give a shit about you?"  That's

20   what he told us.

21        THE DEFENDANT (through the interpreter):  And the

22   saddest part is that Officer Gutierrez, when I fell down --

23   oh, excuse me.  When I --

24        THE DEFENDANT (in English):  I poop in my underwear.

25        THE DEFENDANT (through the interpreter):  I defecated

1    in my panties.  He said, "As a reward, you just earned an

2    extra lunch."

3           It is very tough to be in jail especially when you

4    see your own case on television.  The price you pay is double

5    there.  It's double.  They tell you, "You stole a child.  You

6    kidnapped a child.  You killed a child."  That's what they

7    said to my face.  And you have to believe everything there.

8    And everybody's laughing.  Many times they don't call me by

9    name -- by my name.

10          THE DEFENDANT (in English):  Pussy, fucking --

11          INTERPRETER MENDOZA:  The last was in the English

12   language.

13          THE DEFENDANT (through the interpreter):  And some

14   people, they call them snitches.  I don't know what they

15   commonly call that.  And I Google my case outside -- they

16   Google my case outside.  They said, "Now let your fucking

17   Jesus save you.  I hope you will rot in jail."

18          That's why, your Honor -- I don't know.  If you could

19   put something on my ankles or something so that I could go

20   home because it's so hard.  The bed I sleep on is made of

21   cement.  Sometimes it's metal, but sometimes the sponge is not

22   good so it gets damaged, and my back peels off.  Being in jail

23   is torture mentally, physically, emotionally.  And as far as

24   religion is concerned, you cannot pray.  You're unable to pray

25   because it's a very loud environment almost 24 hours a day.

1        Phone calls are extremely expensive.  It's $10 for

2  each minute to Guatemala.  And to call here locally, $5 for 15

3  minutes.  There are a lot of things, but I just wanted to

4  mention a few.

5        The place where I'm staying right now, there are 12

6  people there, and it's as small as this area here.  That's

7  where we eat.  That's where we shit.  There is one TV set.

8  There's a lot of humiliation going on in jail, especially if

9  you're older, if you have physical limitations like myself.

10        In the name of the Lord, your Honor, and I'm asking

11  for the forgiveness of all the people involved and the aunts

12  and uncles and the cousins and the two brothers and the

13  15-year-old, however many times I hurt you, please forgive me.

14  Sometimes I think that if I were not in jail, my mother would

15  still be with me.  I feel so bad because whenever I needed my

16  mom, she was always there for me, and I couldn't be there when

17  she needed me the most.

18        I wanted to kill myself when I was at the MCC because

19  the majority of the people there are black, and there were

20  very few other people.  I'm talking about the majority of the

21  officers that work there for the most part, they're black.

22  And oftentimes they wouldn't say a word to me.  For the most

23  part, they would not address me or say a single word to me.

24        They have told me that whenever I am free and I am

25  sent out, they are going to find me in the streets to beat me

1  up, particularly in terms of the children.  I don't know what

2  has happened to them or what has continued to happen to them

3  or what's going on with them now.  They don't understand.

4  They don't know what's going on with those grownups.  They're

5  all part of my family.  All of them are my family.

6          Your Honor, please have mercy on me.  I feel like I

7  am perhaps the most sinful woman, so forgive me, your Honor.

8          THE COURT:  All right.  Thank you, Ms. Malinek.  Can

9  you replace your mask, please?

10          Ms. Malinek, federal law tells me what I have to

11  consider in picking a sentence for you.  I do have to consider

12  the nature and circumstances of the crime that you committed.

13  I have to consider your personal history and characteristics.

14  And then I have to take into account certain goals of

15  sentencing that Congress has set out for all judges.

16          I have to promote respect for the law.  The sentence

17  ought to reflect just punishment, and the sentence also must

18  reflect the seriousness of the crime.  I have to provide for

19  the protection of the public.  I have to provide for what in

20  the law we call deterrence.  And there's two forms of this in

21  the law.  One is specific deterrence, meaning picking a

22  sentence that is high enough to encourage you to not commit

23  another crime.  And then there's general deterrence, which is

24  sending a message out generally to the community to not commit

25  this kind of crime.

1          I do have to consider medical needs, rehabilitative

2    needs, vocational needs.  Those needs can only push a sentence

3    down.  It can never be a reason to push a sentence up.  I do

4    have to consider the advice of the sentencing guidelines.  And

5    then lastly, I need to avoid unwarranted disparities which

6    means that I ought to treat you the same way that I treat any

7    other defendant who has committed the same kind of crime that

8    you committed and has the same kind of personal history and

9    characteristics that you do.  And then there is a

10   consideration to restitution which we've discussed today.

11         So I have to balance all of those goals and factors

12   of sentencing and pick a sentence that is enough but not more

13   than necessary to satisfy those goals.

14         All right.  So the first factor is the nature and

15   circumstances of the crime.  And I do hope you realize that

16   forced labor is a horrific crime.  It inflicts an awful

17   emotional and physical toll on the victims.  The victims here,

18   they lived and labored under the constant threat of being

19   arrested and losing their freedom, the threat of deportation

20   which means, of course, an enormously impactful disruption on

21   their lives and the lives of their children.

22         And for Victim 2 as well as Victims 3 and 4, there

23   was also the threat that they would be deported while their

24   children stayed here in the United States, so a threat of

25   separation from their children.  And that threat was proven in

1    the statements of Victims 2, 3, and 4.

2           The victims also described in their grand jury

3    statements consistently that you did verbally abuse them and

4    then ruled the household like a tyrant, constantly adding to

5    their debt by imposing these charges ranging from hundreds of

6    dollars for fraudulent identification documents, for monthly

7    rent -- if you can call it that given the dozens of occupants

8    in the home -- as well as exorbitant charges for daily charges

9    of $10 to clean, as a cleaning fee for the house and

10   necessities like transportation and then charging exorbitant

11   rates like $50 for a ride no matter where it was, all of these

12   charges just unceasingly adding up, adding emotional strain.

13          And these victims believed that it would take years,

14   if ever, for them to pay it back in order for them to be able

15   to leave and move on.  So the emotional toll that it placed on

16   these victims which translated into the physical toll because

17   they had to work in order to avoid deportation -- and that's

18   why it's a forced labor case -- did cause grave harm.

19          I don't believe that your motive was that you said

20   yes to too many people.  That does not ring true because of

21   what you charged them.  And so the motive, I'm afraid, is the

22   motive for many crimes, which is greed.  All of this was

23   proven by the under-oath grand jury statements.  They are

24   consistent in describing the threats of deportation and the

25   charges that added up as well as supported by the written debt

1    ledgers that the government recovered as well.

2         The conditions in which they lived, I don't need to

3    find that there was outright squalor.  I think Mr. Rascia

4    understandably acknowledged that given the sheer number of

5    people in the house, the conditions would have been cramped

6    and stifling no matter what.

7         Victim 1 described at one time there was around 12

8    people living in one room.  Victim 2 described that there was

9    something like 45 persons living in the house at one time

10   including 20 in the basement.  Victim 3 also estimated that

11   there was 22 individuals living in the basement, all sharing

12   one bathroom.  And Victim 5 in his grand jury statement at

13   Page 5 described how there was one month where he could not

14   pay the rent, and you prohibited him from using the bathroom

15   unless he paid.  And he had to borrow money in order to use

16   the bathroom, just a basic living necessity.  And that's the

17   kind of credible detail that I think it does ring true.

18        And then on the day of the arrest, the agents found

19   22 individuals living in the basement and 33 total.  So there

20   isn't any doubt that the conditions would be enormously

21   cramped.  And when one bathroom is shared by over 20

22   individuals, it had to amount to an enormously difficult

23   living situation.

24        This crime also did have impact on the children.  I

25   think as I described earlier, even though for formal United

1   States Sentencing Guidelines purposes, children are not

2   victims of the crime for those purposes, in reality given that

3   I have to consider the nature and circumstances of the crime

4   more broadly, they were victims.

5        Victim 1 at age 15 had to work 40 hours a week

6   standing up in a cold sandwich factory because you told her

7   father that he needed to have her work to pay off the debt

8   faster, and you convinced him to send her to work.  So in a

9   very real plain English sense, she was a victim of this crime.

10       And then there was the tragic injury suffered by

11  Victim 8 and Victim 9's two-year-old child earlier in 2019

12  whose head was burned by the cup of boiling water.  To

13  disallow the child's parents from bringing this toddler to the

14  hospital made this child a victim of the crime as well.  And

15  Victim 8 credibly testified that you told Victim 8 that it

16  would be that parent's, her fault, that you would tell the

17  authorities that it was her fault which would naturally cause

18  separation of the child from Victim 8 and Victim 9.  There's

19  no other way to say it:  That is a cruel threat to level

20  against any parent.

21       And the injury took weeks to recover from.  The PSR

22  describes that when the agents -- there's at least one FBI

23  agent who saw the discoloration and scarring near the hairline

24  of this child weeks later when the case was brought down.  So

25  children too were victims of this crime.

1      I also have to take into account the fact that you

2   also obtained fraudulent identification documents as part of

3   the crime.  So it wasn't just the forced labor which is, of

4   course, serious enough, but there was another entire aspect of

5   this crime involving fraudulent identification documents.  So

6   it is impossible to say that the motive was simply to help

7   others establish a life here.  It was to rack up charges and

8   debts that they would have to pay you.

9      Your sister testified in your support and, of course,

10  that's only natural, but it is easy to compare the very

11  different treatment that she received than what the victims

12  received.  So I don't think that's very much mitigation.  And

13  as the government pointed out, even with her, you did make her

14  sign a document that said she can't move until the debt is

15  paid.

16     You did plead guilty.  I do believe you've accepted

17  responsibility for the crime although, as I said, the motive

18  is not just an inability to say no to people.  That was not

19  the motive for this crime.  You have agreed to pay restitution

20  and to take steps to try to pay that sooner rather than later,

21  and I take that into account as well.

22     You have no criminal history, and that is a fact in

23  your favor as well.  I will note, though, that this crime did

24  take place over at least four years as to Victim No. 10.  So

25  when someone does not have a criminal history, the absence of

1    that criminal history is much more mitigating, it's more

2    persuasive when the defendant then commits a one-time error of

3    judgment because it shows that it truly is an aberration in

4    their lives, but this crime did take place repeatedly and over

5    months and, for Victim 10, years.  And for all we know, it

6    would have continued past March 2019.  It was the government

7    that intervened after hearing about the report from the

8    factory supervisor.  So it could have gone on indefinitely.

9         With regard to your personal history and

10   characteristics going beyond the absence of criminal history,

11   your upbringing was just in extreme poverty.  There's no doubt

12   about that, including an abusive environment.  So the fact

13   that you were able to join a convent and then start serving

14   the public is to your credit.  And you did spend almost two

15   decades on that mission in Wisconsin.  So I'll take that into

16   account, but there is otherwise no direct connection between

17   the enormously difficult childhood, if you can call it that,

18   that you had and the crime itself.  So while again, I'll take

19   it into account, there isn't that kind of direct connection

20   that would mitigate it powerfully.

21        Family separation, of course, I take that into

22   account.  That is the most difficult part of any sentencing,

23   to separate you from your loved ones and to separate your

24   loved ones from you including your husband, your siblings, and

25   your extended family.  And it is tragic that your parents

1    passed while you were detained.  That does happen from time to

2    time with detained defendants.  And as much as the Court, as

3    much as the marshal service would like to accommodate some

4    kind of furlough, it's so very difficult to the point of

5    impossible with pretrial detention and certainly during the

6    pandemic.  So there was nothing anyone really could do about

7    that.

8            It does highlight, and I take it into account, the

9    impact of detention on family relationships.  You mentioned

10   how expensive it is to access the telephone.  And it's true,

11   that's something that Congress and the criminal justice system

12   have been working on for a long time and still has not quite

13   solved.  The FTC has gotten involved -- pardon me, the SEC has

14   gotten involved, but that still has not been solved.  So I

15   understand that detention in prison does mean a substantial

16   restriction on being able to communicate with family.

17           There are many aggravating factors here, though, so I

18   have to take that into account too.

19           Your mental health is a mitigating factor.  There is

20   no doubt that given the diagnoses of anxiety and depression

21   that prison is harder for you than it is for a defendant who

22   does not suffer from those mental disorders.  So I will take

23   that into account.  I understand that when every day of

24   custody for someone who suffers from those disorders is more

25   difficult.  It is more intense than for those who don't.

1          Your physical -- the physical disability, the

2    mobility difficulty also impacts your prison life as well, so

3    I'll take that into account too.

4          In terms of the pandemic, essentially for almost a

5    year now, I have been giving a discount on sentences because

6    pretrial detention and Bureau of Prisons life is much more

7    difficult during the pandemic.  You also have the special risk

8    factor in light of your diabetes, so I'll take that into

9    account too.

10          The other conditions that you've discussed about the

11   MCC and Livingston in terms of both the physical conditions

12   and how you allege you were treated, I cannot make findings on

13   that based on what you have told me.  When issues like that

14   arise in a prosecution, defendants bring those to the Court --

15   well, they first have to file grievances with the detention

16   facility.  And when complaints are made contemporaneous, you

17   know, at the same time, that the alleged events or misconduct

18   is happening, then courts can try to solve that.  We have not

19   litigated here these conditions, so I cannot find and I do not

20   find that those things occurred.

21          I also too have worked on pretrial detention issues

22   with the MCC warden, and he's extremely responsive to

23   complaints.  So that, I'm going to set aside and not consider

24   in your favor.

25          General deterrence, I do have to take general

1   deterrence into account.  There is a debate that has occurred

2   on whether long prison sentences have a general deterrence

3   effect.  And many of the studies that argue that general

4   deterrence does not have an effect, really what they're saying

5   is that they believe that the certainty of punishment has more

6   of a general deterrence effect than long prison sentences, but

7   general deterrence still does have an effect.  So I do believe

8   general deterrence in the whole has an effect.

9           And in particular, in these kind of crimes where it

10  is very difficult to detect, it is important to then set the

11  sentences higher.  Like, the more difficult it is to detect

12  the crime, the higher the sentences have to be when they are

13  detected in order to send a general deterrence message out

14  that these kinds of crimes must stop and they -- and that they

15  will be punished severely if they are detected.  So I have to

16  send a stern and loud message that there must not be human

17  trafficking.

18          All right.  So balancing all of those goals and

19  factors and in order to reflect the seriousness of the crime,

20  provide for general deterrence, I believe the appropriate

21  sentence is a sentence of 78 months of imprisonment.  No fine

22  will be imposed because of the limited ability to pay after

23  restitution is paid.  Restitution will be entered pursuant to

24  the spreadsheet that was circulated amongst the parties before

25  the sentencing.  The preliminary order of forfeiture, that

1    motion at docket entry 69 is granted.

2         For the supervised release, I believe a two-year term

3    at this point is appropriate to accommodate the reintegration

4    back to society and the recidivism risk, although that is a

5    modest risk.  I do have to impose a $100 special assessment in

6    light of the felony conviction.

7         You do have the right to appeal the sentence.  If

8    you're going to appeal, you must file a notice of appeal

9    within 14 days of entry of judgment on the docket.  If you're

10   not able to afford the fees or costs of appeal, then you can

11   ask to have them waived and you won't have to pay them.  If

12   you're not able to afford an attorney on appeal, then you can

13   ask to have one appointed, and one will be appointed free of

14   charge.

15        Is there a facility recommendation?

16        MR. RASCIA:  Pekin, your Honor.

17        THE COURT:  All right.  We'll recommend Pekin.

18        I'm going to also recommend mental health treatment.

19        MR. RASCIA:  Judge, apparently I misspoke about

20   Pekin.  Would it be appropriate if I sent an email to your

21   courtroom deputy tomorrow?  I need to have a further

22   discussion with Ms. Malinek about that.

23        THE COURT:  Yes, that's fine.  And just make sure to

24   copy the government on the email.

25        MR. RASCIA:  I will.

1          THE COURT:  All right.  Is there anything else for

2    the government?

3          MR. PARENTE:  No, your Honor.

4          THE COURT:  All right.  Probation?

5          THE PROBATION OFFICER:  No, your Honor.

6          THE COURT:  Are there -- there are other counts to

7    dismiss, though.

8          MR. PARENTE:  There are, Judge.  I'd move to dismiss

9    counts, I believe it's 1 through 9.

10          THE COURT:  All right.  All the other counts are

11    dismissed.

12          All right.  Mr. Rascia, anything else?

13          MR. RASCIA:  No, Judge.

14          THE COURT:  All right.  We are adjourned.

15        (Proceedings adjourned at 3:59 p.m.)

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2         I, Judith A. Walsh, do hereby certify that the

3   foregoing is a complete, true, and accurate transcript of the

4   proceedings had in the above-entitled case before the

5   Honorable EDMOND E. CHANG, one of the judges of said court, at

6   Chicago, Illinois, on April 19, 2021.

7

8   */s/ Judith A. Walsh, CSR, RDR, F/CRR*_____      July 12, 2021

9   Official Court Reporter

10   United States District Court

11   Northern District of Illinois

12   Eastern Division