UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 19 CR 277-1 |
| v. | Judge Edmond E. Chang |
| CONCEPCION MALINEK | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR
COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(C)(1)(A)(I)**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR.,
United States Attorney for the Northern District of Illinois, hereby provides its
response in opposition to defendant Concepcion Malinek's motion for compassionate
release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *See* Dkt. 126. As discussed below,
defendant has failed to establish that she meets the requirements for relief under
§ 3582(c)(1), and her motion should be denied.

## I.    BACKGROUND

### A.    Offense Conduct and Procedural History

On March 26, 2019, Concepcion Malinek was charged with forced labor, in
violation of 18 U.S.C. § 1589(a)(2) and (a)(4). Dkt. 1.

The offense conduct that led to this charge was summarized as follows in the
Presentence Investigation Report:

> Beginning in 2009 and continuing through her arrest in March 2019, the
> defendant engaged in the labor trafficking of at least 10 individuals, one
> of whom was just 15 years old. The defendant targeted poor individuals

in her former village in Guatemala, who wanted to relocate to the United States by any means. She chose these victims as she believed they would be too scared to contact law enforcement to inform them about the conditions in which they were living. She would offer the victims a chance to live in the United States and would quote a fee of approximately $5,000 for her services.

Once her victims agreed to come to the United States, the defendant assisted them in illegally smuggling across the border and eventually traveling to her residence in Cicero, Illinois. Once the defendant had a victim inside her residence, she would inform the victim of their "debt," which was no longer the original quoted amount and ranged anywhere from $18,000-$42,000.

The defendant obtained fraudulent social security and legal permanent resident cards of the victims so she could obtain work for them at a sandwich assembly factory, where they would work 40 hours per week.

When they were not working, all of the victims resided in the defendant's residence. On the day of the defendant's arrest, there were 33 individuals living in the defendant's single-family home in Cicero, Illinois. Of the total number, 22 individuals shared a single bathroom and resided in the basement sleeping in bunkbeds. The defendant charged each victim hundreds of dollars per month, which she added to their total debt, for rent to live in her home. Agents observed, and victims reported, squalid conditions in the basement, specifically cockroaches and walls covered with mold. At the time of defendant's arrest, law enforcement had information that another group of victims were destined for the defendant's residence.

PSR at 6.

Ten months ago, on April 19, 2021, this Court sentenced Malinek to 78 months' imprisonment, the low end of the guideline range. Dkt. 93, 96; PSR at 17. Defendant was 51 years old at the time. PSR at 3.

On December 22, 2021, Malinek filed a *pro se* motion seeking compassionate release. Dkt. 126. In her filing, defendant seeks a sentence reduction under 18 U.S.C. § 3582(c)(1)(A) based on her mental and physical health and the risk posed to her by COVID-19.

### B.     The Bureau of Prisons' Response to COVID-19

As the Court is aware, from the moment the COVID-19 pandemic began, the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control (CDC) and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry. When an outbreak does occur,

any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.[1]

The BOP's strenuous efforts, now abetted by widespread vaccination (discussed below), have been fruitful. It is notable that the rate of deaths in federal prisons has been comparable to that in the general U.S. population, a substantial achievement given the known risks of viral spread in a congregate prison setting.[2]

Specifically, as it relates to the defendant, BOP's aggressive efforts have extended to FMC Lexington. That institution houses 1,230 inmates.[3] The BOP reports that, as of this writing, there are 25 inmates and 9 staff members with positive cases of COVID-19.[4] The latest statistics are available at www.bop.gov/coronavirus.

---

[1] In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population is now more than 10% lower than it was at the outset of the pandemic, standing at the lowest level in decades.

[2] The BOP reports that there have been 277 inmate deaths related to COVID-19 at BOP institutions (which at the outset of the pandemic held over 157,000 inmates), including eleven deaths from COVID-19 of inmates serving their sentences in home confinement, and there have been over 847,577 deaths from COVID-19 in the general U.S. population. *See* https://www.bop.gov/coronavirus/ ; https://covid.cdc.gov/covid-data-tracker/#datatracker-%20home/ (last accessed Jan. 18, 2022).

[3] *See* https://www.bop.gov/locations/institutions/lex/ (last accessed Jan. 18, 2022).

[4] *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 18, 2022).

BOP worked to ensure that it received COVID-19 vaccines as soon as they became available, and then offered the vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and then offering the vaccines to inmates in order of priority of need in accordance with CDC guidelines. As a court observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

As of this writing, through an intensive effort over the past months, BOP has offered a vaccine to every inmate in BOP-managed institutions. The BOP reports that it has administered a total of 284,099 doses to inmates and staff.[5] Going forward, BOP will continue to offer inmates vaccines, as well as vaccine boosters, as expeditiously as possible as supplies are available.[6] At Federal Medical Center Lexington, where defendant is housed, BOP reports that 1169 of 1230 inmates have been fully vaccinated (a rate of approximately 95 percent).[7] The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each

---

[5] *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 18, 2022). The clinical guidance provided to BOP health services professionals is available at https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf.

[6] *See* https://www.bop.gov/resources/pdfs/covid_19_vaccine_guidance_v14_0_2021.pdf (last accessed Jan. 18, 2022).

[7] *See* https://www.bop.gov/coronavirus/ ; https://www.bop.gov/locations/list.jsp (last accessed Jan. 18, 2022).

institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

## II.  ARGUMENT

### A.  Legal Standard

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391, Title 18, United States Code, Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Pursuant to Congress's directive, prior to the enactment of the First Step Act, the Sentencing Commission promulgated USSG § 1B1.13, which sets forth the Sentencing Commission's policy statement with respect to § 3582(c)(1)(A). Consistent with § 3852(c)(1)(A)(i), § 1B1.13 provides that a court may reduce a term of

imprisonment, after considering the § 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) the reduction is consistent with the factors set forth in 18 U.S.C. § 3553, to the extent relevant. U.S.S.G. § 1B1.13.

As Congress expressly directed, the Sentencing Commission's policy statement defined the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."); *United States v. Saldana*, 807 F. App'x. 816, 819 (10th Cir. 2020).

Application Note 1 to Guideline § 1B1.13 limited the "extraordinary and compelling reasons" for which a sentence reduction is appropriate to the following particular circumstances:

> 1. The defendant suffered from a "terminal illness" or his physical or mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13 cmt. n.1(A).

> 2. The defendant was at least 65 years old, experiencing a serious deterioration in physical or mental health because of the aging process, and served the lesser of 10 years or 75% of his sentence. *Id.* § 1B1.13 cmt. n.1(B).

7

3.    The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.  *Id.* § 1B1.13 cmt. n.1(C).

4.    "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  *Id.* § 1B1.13 cmt. n.1(D).

Guideline § 1B1.13, cmt. n. 1.

In *United States v. Gunn*, No. 20-1959, 980 F.3d 1178 (7th Cir. 2020), the Seventh Circuit held that, because Guideline § 1B1.13 has not been amended following the enactment of the First Step Act, "the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release."  *Id.* at 1180.  Therefore, the court held, district courts are free to consider prisoners' motions for a sentence reduction on grounds other than the categories of extraordinary and compelling reasons listed in Guideline § 1B1.13, as limited by the statute itself.  *Id.*  However, the Court pointed out that:

> [t]he substantive aspects of the Sentencing Commission's analysis in §1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.

*Id.*  Therefore, Guideline § 1B1.13 remains instructive (although, according to *Gunn* not exhaustive) in determining the meaning of the term "extraordinary and

compelling reasons" for purposes of § 3582(c)(1)(A)(i).[8]

Subsequently, the Seventh Circuit provided further guidance regarding consideration of motions for discretionary sentencing reductions under § 3582(c)(1)(A), suggesting a two-step analysis:

> At step one, the prisoner must identify an "extraordinary and compelling" reason warranting a sentence reduction.... Upon a finding that the prisoner has supplied such a reason, the second step of the analysis requires the district court, in exercising the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in § 3553(a) as part of determining what sentencing reduction to award the prisoner.

*United States v. v. Thacker*, 4 F.4th 569, 576 (7th Cir. 2021).

## B. Defendant Has Complied with the Statute's Exhaustion Requirement.

Section 3582(c)(1)(A) provides that "the court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . ."

Defendant submitted two administrative requests for a sentence reduction or compassionate release, which were denied on September 17, 2021 and November 30,

---

[8] The government argued in *Gunn* and in numerous other cases that Guideline § 1B1.13 is binding on the district court in determining motions for compassionate release brought by defendants, and that the courts lack authority to grant relief under the statute on bases other than those enumerated in the application notes that accompany § 1B1.13. The government acknowledges that this argument is foreclosed by *Gunn*. However, the government preserves for potential further review its arguments that *Gunn* was wrongly decided, and that a sentence reduction may be granted under § 3582(c)(1)(A)(i) only where the defendant has established an extraordinary and compelling reason, as defined by Application Notes 1(A) through 1(C) to Guideline § 1B1.13.

2021. Because more than 30 days have elapsed since the warden received defendant's requests, defendant has satisfied § 3582(c)(1)(A)'s exhaustion requirement.

### C. Defendant Has Failed to Establish Extraordinary and Compelling Reasons Warranting Consideration of a Sentence Reduction.

Defendant has failed to satisfy the standard for release under 18 U.S.C. § 3852(c)(1)(A)(i), which requires her to establish that "extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[9]

Defendant argues that, in light of the COVID-19 pandemic, her underlying medical conditions constitute an extraordinary and compelling reason warranting her release. *See* Dkt. 126. Specifically, she asserts that she suffers from serious physical and mental health issues, including diabetes, neuropathy, obesity, depression, post-traumatic stress disorder, and personality disorder. *Id.* She also claims to be disabled from a car accident that occurred in 2015. *Id.* Defendant raised these same medical concerns at her sentencing hearing in April 2021, and the Court took them into account when imposing her sentence. Dkt. 78 at 12; Dkt. 107 at 115-18, 126-27.

Diabetes, obesity, and depression are identified by the CDC as medical conditions that can make a person more likely to get severely ill from COVID-19.[10] A review of defendant's BOP medical records (filed under seal) reflect that she is

---

[9] Because defendant has not served 30 years in prison, she is ineligible for relief under 18 U.S.C. § 3852(c)(1)(A)(ii).

[10] CDC, People with Certain Medical Conditions, Updated Dec. 14, 2021, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html) (accessed Jan. 18, 2022).

currently being treated for these three conditions at FMC Lexington, as well as her other purported conditions. Med. Rec. 3-4, 7-12, 13-15, 17, 23-25, 40-43, 46-48, 50-64. On December 26, 2021, defendant tested positive for COVID-19 and was treated with Tylenol and Benzonatate (a cough suppressant). Med. Rec. 1-2, 87-88, 93. The medical records do not suggest that she experienced severe illness.

Importantly, defendant's medical records also show that, as of July 2021, defendant was fully vaccinated for COVID-19. Specifically, the records show that defendant received her second dose of the Moderna vaccine on July 22, 2021. Med. Rec. 96. She received a booster of the Moderna vaccine on December 2, 2021. *Id.*

Earlier in the pandemic, the government acknowledged that an unvaccinated inmate who presented a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who was not expected to recover from that condition, presented an extraordinary and compelling reason for considering a sentence reduction under § 3582(c)(1)(A)(i). However, at this time, the available vaccines permit effective self-care against severe illness or death that may be caused by COVID-19, even for persons who suffer from chronic medical conditions. The CDC reports that the approved vaccines are proving highly effective, including against COVID-19 variants, stating that, "With other variants, like Delta, vaccines have remained effective at preventing severe illness, hospitalizations, and death. The recent emergence of Omicron further emphasizes the importance of vaccination and

boosters."[11] Even in the small number of breakthrough cases that occur (including defendant's), vaccinated people are less likely to suffer severe illness, hospitalization, or death.[12] And the CDC reports that current data suggests that vaccinated persons with breakthrough infections are contagious for shorter periods of time.[13] Accordingly, the CDC has consistently and strongly advised that every person 12 years of age and older receive one of the vaccines that has received emergency use authorization from the FDA. Thus, current evidence establishes that approved vaccines provide substantial protection against severe illness and death, including in the case of breakthrough infections, and the BOP's intensive effort to vaccinate inmates and staff should further reduce the risk of vaccinated inmates.

Indeed, the Seventh Circuit has held that prisoners who have access to a vaccine cannot obtain compassionate release based on the risk of COVID-19 unless they can establish that they cannot receive or benefit from the vaccine. *United States v. Broadfield*, No. 20-2906, 2021 WL 3076863, at *2 (7th Cir. July 21, 2021) (stating that, although a prisoner who can show that he is unable to receive or benefit from a vaccine still may turn to this statute, the availability of a vaccine makes it impossible for the vast majority of prisoners to establish that the risk of COVID-19 is an "extraordinary and compelling" reason for immediate release); *United States v.*

---

[11] *See* https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (accessed Jan. 18, 2022).

[12] *See* https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (stating that "the vast majority of hospitalization and death caused by COVID-19 are in unvaccinated people.") (accessed Jan. 18, 2022).

[13] *See* https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (stating that "vaccinated people appear to spread the virus for a shorter time") (accessed Jan. 18, 2022).

*Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021) (observing that it would be an abuse of discretion for a judge to grant release based on COVID-19 risk to a prisoner with access to vaccines). *See also United States v. Lemons*, 15 F.4th 747, 751 (6th Cir. 2021).

Accordingly, defendant has not established that the risk posed to her by COVID-19 in light of her medical condition is an extraordinary and compelling reason warranting consideration of a sentence reduction.

**D.     Defendant Has Failed to Show That a Sentence Reduction Would Be Consistent with the Sentencing Factors Set Forth in 18 U.S.C. § 3553(a) Factors.**

Even if defendant had established an extraordinary and compelling reason for release, that showing alone would not entitle defendant to relief.  Under the statute and the applicable policy statement, the Court must also consider the § 3553(a) factors, including whether defendant poses a danger to the community, defendant's history and characteristics, the risk of recidivism she poses, the time remaining on her sentence, and the impact of BOP's efforts to maintain the safety of inmates.  Those factors militate strongly against defendant's early release.

Defendant was convicted of a serious offense in which she exploited extremely vulnerable victims and subjected them to extreme financial, emotional, and physical injury. Victims reported that the defendant was physically and verbally abusive to them and others.  PSR at 7.  The defendant threatened her victims with exposing them to authorities and deportation if they were to tell anyone about the debt they owed her or that they lived in her residence.  *Id.*  Approximately half the victims

13

found living in the home were minors. *Id*. at 9. During the scheme, approximately ten victims paid the defendant a total of $112,545. *Id*. at 7.

Defendant's conduct reflects that she lacks any respect for the law and poses a substantial danger to the community. Only ten months ago, this Court determined that a sentence of 78 months' imprisonment was sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a), and it did so after considering the very arguments defendant makes in this motion. The Court's assessment remains valid, and the defendant has served only a very small portion of her sentence. A sentence reduction would deprecate the seriousness of defendant's criminal conduct, and would undermine the sentence's purposes of promoting respect for the law, affording deterrence, and protecting the public.

In sum, defendant has failed to establish an extraordinary and compelling reason to consider a sentence reduction, and any such reduction would be inconsistent with the sentencing factors set forth in 18 U.S.C § 3553(a). Her motion should be denied.

## III.   CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny defendant's motion.

Respectfully submitted,
JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ *Megan E. Donohue*
MEGAN E. DONOHUE
Assistant United States Attorney
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604

14

(312) 353-1877

Dated: January 19, 2022

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following pleading:

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(C)(1)(A)(I)**

was served on January 19, 2022, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers, and by United States Mail to the following addressee:

**Concepcion Malinek**
Reg. No. 53954-424
FMC Lexington
Federal Medical Center
P.O. BOX 14500
Lexington, KY 40512

By:     */s/ Megan E. Donohue*
        MEGAN E. DONOHUE
        Assistant United States Attorney
        219 S. Dearborn Street
        Chicago, Illinois 60604
Date: January 19, 2022          (312) 353-1877